# COURT OF APPEALS

### OF

## NORTH CAROLINA

### AT

### RALEIGH

---

IN THE MATTER OF THE WILL OF JOHN A. JONES, JR.

No. COA07-4

(Filed 15 January 2008)

**1. Wills— standing of executor—aggrieved party**

The executor of a contested will, who was also the pro-pounder, was an aggrieved party and had standing to appeal an adverse decision of the lower court. The executor is the personal representative of the decedent, stands in the place of the deceased person, and occupies the position of trustee for the persons beneficially interested in the estate.

**2. Wills— contested—undue influence—summary judgment**

The trial court did not err by granting summary judgment against the propounder of a contested will on the issue of undue influence. The propounder failed to show that the testator was susceptible to undue influence at the time he executed the will.

**3. Wills— contested—testamentary capacity—summary judgment**

The trial court did not err by granting summary judgment against the propounder of a contested will on the issue of testamentary capacity. The propounder showed occasional moments of confusion by testator, but not evidence that the testator lacked testamentary capacity when the will was executed. Claims based on general testimony concerning deteriorating physical health and mental confusion do not meet the requirement of specific

1

**IN RE WILL OF JONES**

[188 N.C. App. 1 (2008)]

evidence establishing that testator did not understand his property, to whom he wished to give it, and the effect of the will.

### 4. Wills— devisavit vel non—summary judgment

The trial court did not err by granting summary judgment against the propounder of a contested will on the issue of devisavit vel non where the propounder failed to show the existence of a continuing dispute.

Judge STROUD concurring in part and dissenting in part.

Appeal by Propounder Joseph B. McLeod, CPA, from judgment entered 20 October 2006 by Judge Knox V. Jenkins, Jr., in Johnston County Superior Court. Heard in the Court of Appeals 29 August 2007.

*Brady, Nordgren, Morton & Malone, PLLC, by Travis K. Morton for Propounder appellant.*

*Smith Debnam Narron Wyche Saintsing & Myers, L.L.P., by John W. Narron, for Caveator-appellee.*

McCULLOUGH, Judge.

Propounder appeals order entered granting summary judgment to caveator. We affirm.

### Facts

This case arises out of a challenge to the will of John A. "Buck" Jones, Jr., who died on 11 October 2005, with no children. Caveator Jean Jones is the widow of Mr. Jones. Propounder Joseph B. McLeod is the executor named under the contested will executed in March of 2005. The record on appeal tends to show the following facts: Mr. Jones was born on 6 August 1929. Mr. Jones was the majority shareholder in Carolina Packers, Inc. ("Carolina Packers"), a closely held corporation that operated a meat packing plant in Smithfield, North Carolina. During his life, Mr. Jones served as President of Carolina Packers. Mr. Jones' wife, Ms. Jones, worked for Carolina Packers as well, serving as a member of the Board of Directors.

In 2004, Mr. Jones was diagnosed with cancer. Subsequently, Mr. Jones met with estate planning attorneys Jeff D. Batts and Michael S. Batts of the law firm Batts, Batts & Bell, LLP, for the purpose of executing a will. Mr. Jones instructed these attorneys that he wanted all the household items, the farming operation, the domesticated animals, his gun collection, and any remaining personal effects to be dis-

tributed to his wife, Ms. Jones, on the event of his death. Mr. Jones also stipulated that his cattle should go to Bob Fowler. The residue of Mr. Jones' estate, including his shares of Carolina Packers stock, was to be placed in trust for the benefit of Ms. Jones during her life. Upon Ms. Jones' death, the stock was then to be delivered to Carolina Packers employees Kent Denning, Johnny Hayes, and Lynette Thompson. Under the terms of this will, executed 3 March 2005 (the "March Will"), Mr. McLeod was to be the executor of the will. Mr. McLeod was also named trustee under the resulting trust which was also executed on 3 March 2005 (the "March Trust").

On 1 August 2005, Ms. Jones contacted attorney Michael Batts, informed him that Mr. Jones was in the hospital with a tumor pressing on his spine, and requested a meeting with Mr. Batts to discuss Mr. Jones' will and power of attorney. In response to this request, Michael Batts met with Mr. and Ms. Jones on 5 August 2005.

During this meeting, Ms. Jones voiced her belief that the March Will should be changed so that all of the property, including the cattle and Carolina Packers stock, owned by Mr. Jones would be left to her. Although Mr. Jones agreed that his wife should receive the majority of his property, including his Carolina Packers stock, he disagreed as to who should receive the cattle. Mr. Jones expressed his opinion that Mr. Fowler should receive the cattle, as he had taken care of them. After discussing this with Ms. Jones, the two agreed that Ms. Jones would receive all of Mr. Jones' property other than the cattle, which would be devised to Mr. Fowler.

Mr. Batts became concerned that such a large change in the disposition of Mr. Jones' estate might lead to a will contest. Mr. Batts then asked to speak to Mr. Jones privately to determine if these provisions reflected Mr. Jones' desires for his estate. During this conversation, Mr. Jones indicated that Mr. Batts should just do what his wife wanted. Mr. Jones further indicated that if Ms. Jones wanted to sell Carolina Packers, he would leave that decision up to her and the Board of Directors. Mr. Batts then asked Mr. Jones if he was taking any medications. Mr. Jones responded that he was taking medications, but none of them were "mind altering." Mr. Batts requested that Mr. Jones sign a health information release to allow Mr. Batts to contact Mr. Jones' primary care physician. Mr. Jones responded that he would be willing to sign the release.

In response to Mr. Batts' concerns, Dr. Joan Meehan, Mr. Jones' primary care physician for several years, met privately with Mr. Jones

and examined him on 17 August 2005. During the examination, Mr. Jones expressed his love for his wife and appreciation for the care she had provided him. Dr. Meehan found Mr. Jones to be oriented and in no acute distress at the time of the examination. In the opinion of Dr. Meehan, Mr. Jones was of sound mind and was alert and oriented on the day of the examination.

After talking to the doctor, Mr. Batts remained concerned that the proposed changes to Mr. Jones' March Will represented the desires of Ms. Jones and not those of Mr. Jones. Mr. Batts was unable to determine if Mr. Jones would be voluntarily executing the new will free from any undue influence. As a result of Mr. Batts' concerns, the firm of Batts, Batts & Bell, LLP, declined to prepare a new will for Mr. Jones.

On 31 August 2005, attorney James W. Narron met with Mr. Jones to discuss Mr. Jones' desire to prepare a new will and trust. Following this meeting, Mr. Narron drafted these documents for Mr. Jones and presented them to Mr. Jones on 1 September 2005. After reviewing the documents prepared by Mr. Narron, Mr. Jones signed the will (the "September Will") and trust (the "September Trust") before two witnesses and a notary. Mr. Jones' September Will expressly revoked all earlier wills and codicils. Mr. Jones died on 11 October 2005.

On 14 October 2005, Mr. McLeod submitted the March Will to the Superior Court of Johnson County for probate, despite knowledge that Mr. Jones had executed a subsequent will. The March Will was then admitted to probate and letters testamentary were issued to Mr. McLeod. On 18 October 2005, Ms. Jones filed a caveat to the will alleging the existence of another document, the September Will, as the Last Will and Testament of Mr. Jones. The caveat alleged that the March Will had been expressly revoked by the subsequent September Will. In response to this caveat, an order suspending Mr. McLeod's administration of Mr. Jones' estate was entered on 18 October 2005.

On 7 November 2005, Mr. McLeod filed a motion asserting that a controversy existed as to the competence of Mr. Jones at the time he executed the September Will. Specifically, Mr. McLeod alleged the possible existence of undue influence.

Following a 5 December 2005 hearing, the Honorable Benjamin G. Alford filed an Alignment Order on 6 February 2006. Under the terms of this order, Mr. McLeod was aligned with Lynette Thompson, Johnny Hayes, and Kent Denning as Propounders. Ms. Jones was

aligned as the sole caveator. Mr. Fowler was found by the court to be an unaligned party.

On 12 July 2006, Caveator filed a motion for summary judgment. In support of her motion, Caveator presented three affidavits on 12 July 2006, and an additional eight affidavits on 12 September 2006. On 20 September 2006, Propounders filed eight affidavits in opposition to Caveator's motion for summary judgment.

On 25 September 2006, Caveator's motion for summary judgment was heard by the Honorable Knox V. Jenkins, Jr. On 20 October 2006 Judge Jenkins entered, over Propounders' objections, an order granting summary judgment in favor of Caveator and directing the Clerk of the Superior Court of Johnston County to accept for probate the September Will.

On 24 October 2006, Propounder Joseph B. McLeod filed notice of appeal and a motion for stay pending appeal. On 9 November 2006, the trial court denied Propounder's motion for stay pending appeal. On 13 November 2006, Propounder filed a petition for writ of supersedeas and motion for temporary stay with this Court. This Court granted Propounder's motion for temporary stay on 14 November 2006. Propounder's petition for writ of supersedeas was subsequently denied and the temporary stay was dissolved on 1 December 2006.

On appeal, Propounder argues that the trial court committed reversible error by entering summary judgment against him. Further, Propounder argues the trial court erred in denying a stay of the judgment pending appeal. For the reasons set forth herein, we disagree with Propounder's arguments and uphold both the order and the judgment of the trial court.

I.

[1] As a preliminary matter, Caveator has filed a motion to dismiss Propounder's claims for lack of subject matter jurisdiction. Specifically, Caveator alleges 'that this Court did not obtain subject matter jurisdiction because the sole appellant in this matter, Propounder, is not an "aggrieved party," and thus lacks standing to appeal the decision of the lower court. We deny this motion.

"Only a 'party aggrieved' may appeal from an order or judgment of the trial division." *Culton v. Culton*, 327 N.C. 624, 625, 398 S.E.2d 323, 324 (1990), *superseded by statute on other grounds as stated in In re J.A.A.*, 175 N.C. App. 66, 72-73, 623 S.E.2d 45, 49 (2005); *see* N.C.

R. App. P. 3(a) (2005). "A party aggrieved is one whose rights are substantially affected by judicial order." *Carawan v. Tate*, 304 N.C. 696, 700, 286 S.E.2d 99, 101 (1982). If the party seeking appeal was not an aggrieved party, he has no standing to challenge the order of the trial court and his appeal should be dismissed. *Culton*, 327 N.C. at 626, 398 S.E.2d at 325.

In the instant case, Caveator argues that Propounder was not an aggrieved party. As Propounder was only the executor rather than a beneficiary under the March Will, Caveator contends that Propounder's rights were not substantially affected. Therefore, Caveator asserts, Propounder lacks standing to appeal the order of the trial court.

Caveator's contention raises an issue of first impression for this Court. In support of her argument that an executor lacks standing to appeal from the order of the trial court, Caveator points to the cases of *Gregg v. Williamson*, 246 N.C. 356, 362, 98 S.E.2d 481, 487 (1957), and *Summerlin v. Morrisey*, 168 N.C. 409, 410, 84 S.E. 689, 690 (1915), in which fiduciaries were denied standing to appeal from judgments of the lower court. However, the instant case can be distinguished from *Gregg* and *Summerlin* on its facts.

In *Gregg*, the North Carolina Supreme Court sought to determine whether a trustee of a mortgage could properly appeal from the judgment of the trial court. *Gregg*, 246 N.C. at 356-62, 98 S.E.2d at 481-87. In conducting its analysis, the *Gregg* Court noted:

> Plaintiff does not claim to be the owner of those notes or assert any right thereto; at least no such claim is disclosed by this record. Plaintiff's right, as we have noted, to demand possession accrues only when the owner of the debt so directs. Having no interest in the debt and being without authority to act until requested so to do by a party secured, plaintiff is not a party aggrieved.

*Id.* at 362, 98 S.E.2d at 487. Therefore, the Court dismissed plaintiff's appeal. *Id.*

*Summerlin* involved an appellant who was appointed as a commissioner to execute a land sale for the repayment of a debt. *Summerlin*, 168 N.C. at 409-10, 84 S.E. at 689-90. When directed by the lower court to execute a second deed correcting an error in the original deed, the commissioner appealed. *Id.* In dismissing the commissioner's appeal, the Supreme Court held:

The commissioner is not a party to this action and has no personal interest whatever in the subject of it. It is his duty to obey and not to review judgments of the court appointing him. No judgment has been rendered against him, and if the court has made a mistake, as the appellant contends, that is a matter for the parties to correct by appeal, if they are inclined to do so, and it is not a matter for the commissioner.

*Id.* at 410, 84 S.E. at 690.

As previously noted, the instant case, like those presented in *Gregg* and *Summerlin,* involves the standing of a fiduciary to appeal an order from the trial court. Unlike those cases, however, the instant case is being brought by the executor of an estate. The executor, as a personal representative of the decedent, must serve in a dual capacity. *Allen v. Currie, Commissioner of Revenue,* 254 N.C. 636, 640, 119 S.E.2d 917, 920 (1961). The executor stands in the place of the deceased person for the purpose of settling his business affairs and distributing his estate, but also occupies the position of trustee for those persons beneficially interested in the estate. *Id.*

The case law of this state has not previously addressed whether an executor would qualify as an aggrieved party on appeal. In examining the case law of other states that have addressed this issue, we find the analysis of the Kentucky Court of Appeals particularly instructive:

It is made the duty of the executor to execute the will of the testator, and it is also incumbent upon him to present the will to the county court of the testator's residence for probate; and while he cannot act as executor until his qualification as such, it is difficult to perceive how he can qualify until the paper is adjudged to be the last will of the devisor; and having presented the paper to the proper tribunal for probate, it would be a dereliction of duty on the part of the executor, if he was satisfied that the paper was the last will of the testator, to permit its probate [to be] denied without any additional effort to have the will recorded.

It is true the judgment of the County Court would ordinarily protect the executor; but as the duty of executing the will has been confided to him by the devisor, good faith requires that he should exhaust the remedy afforded him by law for having the will probated, if he is satisfied it was improperly rejected by the County Court.

*Pryor v. Mizner,* 79 Ky. 232, 234 (1881). We find this rationale persuasive and hold that Propounder, as the named executor under the March Will, was an aggrieved party as specified in the North Carolina Rules of Appellate Procedure. N.C. R. App. P. 3(a) (2005). Therefore, Propounder possessed standing to appeal from a trial court order denying the probate of that will. Caveator's Motion to Dismiss is denied.

II.

Propounder argues the trial court committed error in granting Caveator's Motion for Summary Judgment. Specifically, Propounder argues that the trial court committed reversible error by entering summary judgment against him on the issues of (A) undue influence by the caveator, Jean Jones; (B) testamentary capacity of the testator, Buck Jones; and (C) *devisavit vel non.* We will address each of Propounder's arguments in turn.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2005). "Where a motion for summary judgment is supported by proof which would require a directed verdict in [the movant's] favor at trial he is entitled to summary judgment unless the opposing party comes forward to show a triable issue of material fact." *In re Will of Edgerton,* 29 N.C. App. 60, 63, 223 S.E.2d 524, 526, *disc. review denied,* 290 N.C. 308, 225 S.E.2d 832 (1976). Summary judgment should be entered cautiously. *Volkman v. DP Associates,* 48 N.C. App. 155, 157, 268 S.E.2d 265, 267 (1980). However, if the party with the burden of proof cannot prove the existence of each essential element of its claim or cannot produce evidence to support each essential element, summary judgment is warranted. *See Development Corp. v. James,* 300 N.C. 631, 638, 268 S.E.2d 205, 210 (1980). "[T]he standard of review on appeal from summary judgment is whether there is any genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law." *Bruce-Terminix Co. v. Zurich Ins. Co.,* 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998).

A.

[2] Propounder first contends sufficient evidence was presented at trial to create an issue of fact as to the existence of undue influence on the testator in the execution of the September Will. We disagree.

To withstand a motion for summary judgment against him, a party seeking to contest a will on the grounds of undue influence must prove the existence of "(1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence." *Griffin v. Baucom*, 74 N.C. App. 282, 286, 328 S.E.2d 38, 41, *disc. review denied*, 314 N.C. 115, 332 S.E.2d 481 (1985)). We recognize that

· [b]ecause the existence of undue influence is usually difficult to prove, our courts have recognized that it must usually be proved by evidence of a combination of surrounding facts, circumstances and inferences from which a jury could find that the person's act was not the product of his own free and unconstrained will, but instead was the result of an overpowering influence over him by another.

*In re Will of Dunn*, 129 N.C. App. 321, 328, 500 S.E.2d 99, 104, *disc. review denied, disc. review dismissed as moot*, 348 N.C. 693, 511 S.E.2d 645 (1998). *See also In the Matter of the Will of Everhart*, 88 ·N.C. App. 572, 574, 364 S.E.2d 173, 174, *disc. review denied*, 322 N.C. 112, 367 S.E.2d 910, 911 (1988).

The influence exerted upon Mr. Jones had to be "of a kind which operate[d] on the mind of the testator at the very time the will [was] made, and cause[d] its execution." *In re Will of Thompson*, 248 N.C. 588, 593, 104 S.E.2d 280, 284 (1958). For such influence to be undue,

"there must be something operating upon the mind of the person whose act is called in judgment, of sufficient controlling effect to destroy free agency and to render the instrument, brought in question, not properly an expression of the wishes of the maker, but rather the expression of the will of another. 'It is the substitution of the mind of the person exercising the influence for the mind of the testator, causing him to make a will which he otherwise would not have made.' "

*In re Will of Kemp*, 234 N.C. 495, 498, 67 S.E.2d 672, 674 (1951) (citations omitted). Undue influence has also been described as

a fraudulent influence, or such an overpowering influence as amounts to a legal wrong. It is close akin to coercion produced by importunity, or by a silent, resistless power, exercised by the strong over the weak, which could not be resisted, so that the end reached is tantamount to the effect produced by the use of fear or force. To constitute such undue influence, it is not necessary that

there should exist moral turpitude, but whatever destroys free agency and constrains the person, whose act is brought in judgment, to do what is against his or her will, and what he or she otherwise would not have done, is a fraudulent influence in the eye of the law.

*In re Will of Turnage*, 208 N.C. 130, 132, 179 S.E. 332, 333 (1935).

Our Supreme Court has identified seven factors that are probative on the issue of undue influence:

1. Old age and physical and mental weakness of the person executing the instrument.

2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.

3. That others have little or no opportunity to see him.

4. That the instrument is different and revokes a prior instrument.

5. That it is made in favor of one with whom there are no ties of blood.

6. That it disinherits the natural objects of his bounty.

7. That the beneficiary has procured its execution.

*Hardee v. Hardee*, 309 N.C. 753, 756-57, 309 S.E.2d 243, 245 (1983); *see also In re Andrews*, 299 N.C. 52, 55, 261 S.E.2d 198, 200 (1980).

The list set forth above does not list all of the factors that can be considered. In *Griffin*, 74 N.C. App. 282, 328 S.E.2d 38, this Court noted that two of the factors pertinent in determining the existence of undue influence are "whether [the testator] had independent or disinterested advice in the transaction" and the "distress of the person alleged to have been influenced." *Id.* at 286, 328 S.E.2d at 41.

Here, Buck Jones had independent and disinterested advice from two separate lawyers. Ms. Jones was not present during either conference. Although the propounder presented evidence that Ms. Jones may have overheard one of the conferences on a baby monitor, it is still undisputed that she was not present to counter or inhibit the lawyers' advice. Both lawyers stressed that the will was Mr. Jones' decision and that the terms were solely up to him. The Honeycutt affidavit attaching memos of the two meetings with Mr. Narron indicates that Mr. Jones was specifically told that if the will was not what he wanted, then he just had to say so. With respect to the "distress" fac-

tor, the Young affidavit states that Mr. Jones expressed satisfaction with his new will and the Honeycutt affidavit reflects that he signed the will without hesitation. Mr. Narron further testified in his deposition that "there was not one thing that was the matter with Buck's mind or his ability to make a decision or his determination on what he was going to do."

The party contesting the validity of the will need not prove the existence of every factor. *In re Estate of Forrest*, 66 N.C. App. 222, 225, 311 S.E.2d 341, 343, *aff'd and remanded*, 311 N.C. 298, 316 S.E.2d 55 (1984). However, the contesting party must present "sufficient evidence to make out a *prima facie* case." *Id.* According to our case law:

> In a proceeding to [contest] a will, the [contesting parties] are required to handle the laboring oar on the issue of undue influence . . . . True, in certain fiduciary relations, if there be dealings between the parties, on complaint of the party in the power of the other, the relation of itself, and without more, raises a presumption of fraud or undue influence, as a matter of law, and annuls the transaction unless such presumption be rebutted by proof that no fraud was practiced and no undue influence was exerted. . . .
>
> . . . It is sufficient to rebut a presumption by evidence of equal weight rather than by a preponderance of the evidence, where the burden of the issue is on the opposite party. . . . Strictly speaking, the burden of the issue, as distinguished from the duty to go forward with evidence, does not shift from one side to the other, for the burden of proof continues to rest upon the party who alleges facts necessary to enable him to prevail in the cause. It is required of him who thus asserts such facts to establish them before he can become entitled to a verdict in his favor; and, as to these matters, he constantly has the burden of the issue, whatever may be the intervening effect of different kinds of evidence or of evidence possessing under the law varying degrees of probative force.

*In re Will of Atkinson*, 225 N.C. 526, 530-31, 35 S.E.2d 638, 640-41 (1945) (citations omitted). Thus, the party seeking to contest the will "must fail if upon the whole evidence he does not have a preponderance, no matter whether it is because the weight of evidence is with the other party or because the scales are equally balanced." *Winslow v. Hardwood Co.*, 147 N.C. 275, 277, 60 S.E. 1130, 1131 (1908).

IN RE WILL OF JONES

[188 N.C. App. 1 (2008)]

Propounder argues that he presented sufficient evidence to raise a question of fact as to each of the requirements necessary to establish a *prima facie* case for undue influence. With regard to the first requirement, Propounder argues that decedent, Mr. Jones, was susceptible to undue influence. To support this contention, Propounder attempted to show: Mr. Jones was suffering from old age and physical and mental weakness (Factor No. 1); Mr. Jones was in the home of the beneficiary, Ms. Jones, and subject to her constant control (Factor No. 2); and that other people were provided little or no opportunity to see Mr. Jones (Factor No. 3).

As to the first factor, Propounder points to the fact that Mr. Jones was 76 when he signed the September Will. Propounder further argues that Mr. Jones was in a weakened physical condition from 1 August 2005 through 1 September 2005, when he executed the September Will. According to Propounder, Mr. Jones' spirt was broken during this time period and he was "very vulnerable" to undue influence at the time he executed the September Will. Propounder also suggests that Mr. Jones' judgment may have been impaired by the pain medications he was taking, claiming Mr. Jones was "taking more than the prescribed amount."

However, Propounder's own evidence demonstrates that Mr. Jones was still making his own decisions on significant matters. Mr. Batts' notes indicate that, although Ms. Jones desired otherwise, Mr. Jones would not agree to sign a health care power of attorney because he did not wish to give anyone the right to say whether he lived or died or to make decisions on his health care. According to Mr. Batts, Mr. Jones even got "a little irritated." In addition, Mr. Jones directed the sale of a Lear jet and communicated with Propounder regarding that $4,000,000 sale.

On the susceptibility issue, Propounder and the dissent primarily rely upon Mr. Jones' medical condition, pointing to a note from Dr. Hoffman referring to Ms. Jones as a surrogate decision maker. Dr. Hoffman, however, explained in his deposition that, at that visit, Mr. Jones had undergone a laminectomy the day before and that during the post-operative period, there can be some confusion. During the relevant time frame in September, however, he found Mr. Jones alert and oriented and testified that he "didn't seem to have trouble making decisions about what he wanted to do." He said that Mr. Jones was able to understand the proposed course of therapy and decide that he wanted to proceed with it. Similarly, his primary care physician, Dr. Meehan, submitted an affidavit that as of 13 September 2005, his

mental condition had not deteriorated and it was not affected by his pain medications.

Propounder presented no contrary expert testimony. Instead, he relied upon assertions that Mr. Jones seemed increasingly tired, weak, and defeated and speculation regarding the possible effects of pain medication. This lay evidence—consistent with someone failing in his battle against cancer—is not sufficient to counter the expert testimony of Mr. Jones' doctors. This Court has previously found comparable evidence insufficient. *In re Estate of Whitaker,* 144 N.C. App. 295, 301-02, 547 S.E.2d 853, 858-59, *disc. review denied,* 354 N.C. 218, 555 S.E.2d 278 (2001); *In re Will of Prince,* 109 N.C. App. 58, 63, 425 S.E.2d 711, 714-15 (1993); *In re Coley,* 53 N.C. App. 318, 324, 280 S.E.2d 770, 774 (1981).

With regard to the second factor, Propounder points to testimony that Mr. Jones was in a wheelchair and unable to perform many every-day tasks without the assistance of Ms. Jones with whom he lived. Propounder argues the level of care required by Mr. Jones effectively left him under the supervision of Ms. Jones.

With regard to the third factor (isolation), Propounder points to evidence that Ms. Jones removed the phone from Mr. Jones' room in September 2005. Propounder also argues that prior to the removal of the phone, Ms. Jones would screen Mr. Jones' calls and prohibit him from talking with others.

While Propounder argues that Ms. Jones kept the decedent isolated, the evidence of record contradicts this argument. The Powell affidavit indicates that he saw Mr. Jones on an almost daily basis from August until October. Ms. Mims visited Mr. Jones one to two times a week in August and September 2005. Hill visited two to three days per week in August and September. Sinclair visited him once a day during the same two months. Benson saw him two times in August and September, but talked to him numerous times on the phone. Oates saw him every week day from July to October and took him at times to his office and to meet with other people. Propounder submitted the affidavit of Fowler who indicated that he was able to see Mr. Jones. Propounder himself had numerous communications with Mr. Jones regarding the sale of a Lear jet.

The only evidence pointed to by Propounder on this factor is the Blackmon Affidavit and Mr. Batts' inability to speak to Mr. Jones on a single day. Ms. Blackmon stated that she was not able to visit Mr.

Jones because she was informed by an unnamed person that Ms. Jones did not want her to visit. That evidence is inadmissible hearsay and cannot be considered in connection with a summary judgment motion. In any event, Ms. Blackmon does state that she had her "last visit" in August or September, so it appears that she did indeed visit Mr. Jones. The fact that Mr. Batts did not get through on one day cannot be sufficient evidence to raise an issue of fact on this factor.

With regard to the third requirement necessary to establish a *prima facie* case for undue influence, Propounder contends Ms. Jones was motivated and disposed to exert undue influence on Mr. Jones in an effort to change his will. Specifically, Propounder presented evidence that Ms. Jones made statements illustrating her desire to take a larger portion of Mr. Jones' estate than provided under the March Will. Propounder also points to evidence that Ms. Jones believed the funds provided under the March Will would not be sufficient to support her lifestyle.

With regard to the fourth, and final, requirement necessary to establish a *prima facie* case for undue influence, Propounder contends the result of the will was indicative of undue influence. Propounder points to the fact that the September Will revokes the previously executed March Will (Factor No. 4). Propounder also presents evidence that the September Will changed the disposition of Mr. Jones' Carolina Packers stock, providing that all of the stock should go to Ms. Jones. According to Propounder, this provision runs contrary to wills executed by Mr. Jones in 1992 and 2001, as well as the March Will. In sum, Propounder believes his evidence would permit a jury to infer that the will and other documents signed by Mr. Jones on 1 September 2005 were not the result of his free will, but rather the intent of Ms. Jones. Thus, Propounder believes summary judgment was precluded as a matter of law.

Although Propounder has put forth the arguments described above, we do not find that Propounder has carried his burden of proving undue influence. Specifically, Propounder has failed to show that Mr. Jones was susceptible to undue influence at the time he executed the September Will. We have previously noted that the mental condition of the testator at the time he makes a will is

" 'perhaps, the strongest factor leading to the answer to the [fraud and undue influence] issue.' " Without evidence that the testator is susceptible to fraud or undue influence, evidence of undue influence itself is often too tenuous for consideration.

*In re Will of Campbell,* 155 N.C. App. 441, 457, 573 S.E.2d 550, 562 (2002), *disc. review denied,* 357 N.C. 63, 579 S.E.2d 278 (2003) (citations omitted).

The evidence presented in the record indicates that Mr. Jones was a strong-willed man who was very specific in voicing his desires, and remained so into the final months of his life. During the months of August and September, Mr. Jones commissioned a local painter, Lee Mims, to provide him with a painting. Mr. Mims describes Mr. Jones as being very demanding and detailed as to his desires for the final painting. Further evidence of Mr. Jones' resolute nature was displayed during his 5 August 2005 meeting with Mr. Batts for the purpose of revising his will. Although Mr. Jones directed that a majority of his estate be devised to his wife, which was clearly in accordance with Ms. Jones' wishes, Mr. Jones did not acquiesce to her every request. When Ms. Jones objected to the provision of the will devising Mr. Jones' cattle to Mr. Fowler, Mr. Jones remained unwavering, and instructed Mr. Batts that the provision was to remain intact in the subsequent will, despite his wife's protests.

Mr. Jones was also familiar with the process of drafting and revising wills, having executed wills in 1992, 2001, March 2005, and September 2005. Although Mr. Batts expressed some concern that the proposed revisions to the March Will might have been influenced by Ms. Jones, Mr. Batts was unable to determine if the changes also reflected the desires of Mr. Jones. Following Mr. Batts' declination, Mr. Jones then consulted Mr. Narron to prepare the revised will. From his meetings with Mr. Jones, Mr. Narron was of the opinion that Mr. Jones possessed the mental capacity to understand what a will was, to know what his property was, to understand the effect of making a will on his property, to understand who his family was, and to express his intention and belief on all such issues at the time Mr. Jones signed the will. Further, Mr. Narron noted that at the time Mr. Jones signed the September Will, he did not appear to be under the undue influence of anyone.

In sum, Ms. Jones submitted evidence from a well-regarded attorney who prepared the will that the attorney gave independent advice to Mr. Jones, with Ms. Jones not present, stressing that the will had to be consistent with Mr. Jones' wishes. Mr. Jones signed it without hesitation. Two of his treating physicians testified that during the relevant time frame, Mr. Jones' pain medications were not affecting his mental condition, he was capable of making his own decisions, and in fact was making decisions regarding his course of treatment. Further,

Ms. Jones' evidence indicated that Mr. Jones was seeing various people multiple days in the week, with some coming daily; he talked on the telephone; and he was even traveling to his office and other locations. Various of these people, who saw him regularly, swore that he was demanding, was making his own decisions, and was not intimidated by Ms. Jones.

To counter this evidence, Propounder offered only a lawyer's inability to determine what Mr. Jones' desires were, evidence that on one day that lawyer was unable to reach Mr. Jones, and that Mr. Jones was in poor health and taking pain medications. That same evidence, however, established that Mr. Jones made his own decisions regarding a health care power of attorney, the disposition of cattle in his will, and the sale of a Lear jet.

Upon review, the record contains no specific evidence that Mr. Jones was subject to undue influence at the time he executed the September Will. We note that the mere fact that Mr. Jones bequeathed a substantial portion of his estate to his wife, by itself, is not sufficient to prove that Ms. Jones exerted undue influence on her husband. *See In re Broach's Will,* 172 N.C. 520, 523-24, 90 S.E. 681, 683 (1916). Thus, we believe Propounder has failed to present specific facts showing that Mr. Jones' will was executed solely as a result of fraudulent and overpowering influence by Ms. Jones that controlled Mr. Jones at the time he executed the documents. *Whitaker,* 144 N.C. App. at 299-302, 547 S.E.2d at 857-59. We therefore hold the trial court did not commit error in granting summary judgment on the issue of undue influence.

B.

[3] Propounder next argues sufficient evidence was presented at trial to create an issue of fact as to the absence of testamentary capacity on the part of the testator in the execution of the September Will. We disagree.

"The law presumes that a testator possessed testamentary capacity, and those who allege otherwise have the burden of proving by the preponderance or greater weight of the evidence that he lacked such capacity." *In re York's Will,* 231 N.C. 70, 70, 55 S.E.2d 791, 792 (1949). To establish testamentary incapacity, a party contesting a will must show that one of the essential elements of testamentary capacity is lacking. *Kemp,* 234 N.C. at 499, 67 S.E.2d at 675. "It is not sufficient for a [contesting party] to present 'only general testimony concerning testator's deteriorating physical health and mental confusion in the

IN RE WILL OF JONES

[188 N.C. App. 1 (2008)]

months preceding the execution of the will, upon which [a contesting party] based [his] opinion[] as to [the testator's] mental capacity.' " *In re Will of Smith,* 158 N.C. App. 722, 725, 582 S.E.2d 356, 359 (2003) (citation omitted). A contesting party must present specific evidence "relating to testator's understanding of his property, to whom he wished to give it, and the effect of his act in making a will at the time the will was made." *In re Will of Buck,* 130 N.C. App. 408, 413, 503 S.E.2d 126, 130 (1998), *aff'd in part, rev'd on other grounds and remanded,* 350 N.C. 621, 516 S.E.2d 858 (1999).

Propounder presents no specific evidence that Mr. Jones lacked testamentary capacity at the time he executed the September Will. Rather, Propounder argues Mr. Jones had a general lack of testamentary capacity as evidenced by his lack of good judgment and confusion in dealing with other matters. Specifically, Propounder points to evidence that Mr. Jones suffered from moments of confusion when confronted with his medical diagnosis. During a medical consultation with Mr. Jones on 1 August 2005, Dr. Leroy G. Hoffman noted that Mr. Jones had multiple lesions in his brain compatible with metastatic disease and that Mr. Jones might be a candidate for palliative radiation therapy. Unsure if Mr. Jones fully understood his diagnosis and the possible treatment options, Dr. Hoffman elected to discuss these options with Ms. Jones when she arrived. Mr. Jones exhibited similar confusion in an earlier meeting with Dr. Christopher G. Nelson on 28 July 2005. During this meeting, Dr. Nelson noted that Mr. Jones was confused and unable to make decisions at the present time, so Ms. Jones was serving as his surrogate decision maker.

Propounder also argues that other evidence seems to show Mr. Jones was generally confused. Propounder points to testimony by Kent Denning that Mr. Jones appeared confused on occasion during the summer of 2005. Other testimony, proffered by Mr. Fowler, describes Mr. Jones' sale of cattle in August of 2005 as being irrational. According to Mr. Fowler, Mr. Jones' behavior during this transaction "did not exhibit an understanding of the nature and value of his property, and showed a lack of judgment and insight."

Upon review, Propounder has shown only that the testator suffered occasional moments of confusion, but has provided no evidence that Mr. Jones lacked testamentary capacity at the time the September Will was executed. Although the record contains evidence that Mr. Jones was confused while discussing treatment options on 28 July 2005 and 1 August 2005, further evidence indicates that no such confusion existed when Mr. Jones executed the September Will. On 1

IN RE WILL OF JONES

[188 N.C. App. 1 (2008)]

September 2005, Dr. Hoffman again met with Mr. Jones to discuss his medical treatment. During this discussion, Dr. Hoffman found Mr. Jones to be "competent and capable of making his own decisions." Dr. Hoffman further opined that Mr. Jones "had the mental capacity to understand what a Will was, to know what his property was, to understand the [e]ffect of making a Will on his property, to understand who his family was, and to express his intention and belief on all such issues." Even had Mr. Jones exhibited such confusion at the time he executed the September Will, we note that his confusion as to medical treatment does not constitute circumstantial evidence of a lack of testamentary capacity.

Propounder's other claims based on general testimony concerning Mr. Jones' deteriorating physical health and mental confusion in the months preceding the execution of the September Will are similarly unpersuasive. Such claims do not meet the requirement of specific evidence establishing that Mr. Jones did not understand his property, to whom he wished to give it, and the effect of his act in making the will at the time the will was executed. *See Whitaker*, 144 N.C. App. at 299, 547 S.E.2d at 857. Mr. Jones had an absolute right to disinherit anyone he chose. *In re Will of Edgerton*, 29 N.C. App. at 63, 223 S.E.2d at 527; *Kidder v. Bailey*, 187 N.C. 505, 507, 122 S.E. 22, 23 (1924). As this Court has previously noted, "a will is not void if it has been obtained by fair argument or persuasion, even if an unequal disposition of the testator's property is the end result." *Campbell*, 155 N.C. App. at 460, 573 S.E.2d at 563. "It is not necessary that the testator should be able to dispose of his property with judgment and discretion—wisely or unwisely, for he may do with his own as he pleases; but it is enough if he understands the nature and effect of his act and knows what he is about." *In re Craven*, 169 N.C. 561, 567, 86 S.E. 587, 591 (1915). As the evidence presented by Propounder is insufficient to show that Mr. Jones did not understand the nature and effect of his action in executing the September Will, we find that Propounder has failed to present an issue of fact as to the absence of testamentary capacity on the part of Mr. Jones at the time he executed the September Will. Therefore, we hold the trial court did not commit error in granting summary judgment on the issue of testamentary capacity.

C.

[4] Propounder argues the trial court erred in granting summary judgment on the issue of *devisavit vel non*. We disagree.

**IN RE WILL OF JONES**

[188 N.C. App. 1 (2008)]

"Upon the filing of the *caveat* the proceeding is transferred [to superior court] . . . for trial before a jury . . . [so] that the court may determine whether the decedent left a will and, if so, whether any of the scripts before the court is the will." *In re Will of Charles*, 263 N.C. 411, 415, 139 S.E.2d 588, 591 (1965). The question of whether a valid will exists is known as *devisavit vel non*, translated from Latin as " 'he devises or not.' " *In re Will of Mason*, 168 N.C. App. 160, 162, 606 S.E.2d 921, 923, *disc. review denied*, 359 N.C. 411, 613 S.E.2d 26 (2005) (citations omitted). "Devisavit vel non requires a finding of whether or not the decedent made a will and, if so, whether *any of the scripts* before the court is that will." *In re Will of Hester*, 320 N.C. 738, 745, 360 S.E.2d 801, 806, *reh'g denied*, 321 N.C. 300, 362 S.E.2d 780 (1987) (emphasis in original).

In a caveat proceeding it is "the duty of the trial judge to submit such issues to the jury as are necessary to resolve the material controversies arising upon the pleadings and the evidence." *Dunn*, 129 N.C. App. at 325, 500 S.E.2d at 102. However, the entry of summary judgment and a directed verdict may be appropriate under certain circumstances. *Mason*, 168 N.C. App. at 165, 606 S.E.2d at 924. We have previously noted that "although motions for directed verdict have not generally been granted in caveat proceedings, . . . propounders may move for directed verdict on the issue of whether a validly executed will exists . . . and . . . caveators may move for directed verdict at the close of the propounders' case[.]" *In re Will of Smith*, 159 N.C. App. 651, 655-56, 583 S.E.2d 615, 619 (2003).

In the case *sub judice*, Propounder argues the trial judge should not have granted summary judgment on the issue of *devisavit vel non*. According to Propounder, the issue of *devisavit vel non* should have gone to the jury. However, Propounder fails to show the existence of a continuing dispute as to the validity of the September Will. Propounder does not dispute the existence of the September Will, the contents of the September Will, or even the fact that the September Will was executed subsequent to the execution of the March Will. Propounder only challenges the validity of the September Will on the aforementioned grounds of undue influence and testamentary capacity. Having already addressed Propounder's arguments with respect to these issues, and having found them to be without merit, we find that there is no remaining evidentiary conflict as to the validity of the September Will. *See In re Will of Mason*, 168 N.C. App. at 165, 606 S.E.2d at 924. Thus, as there were no remaining issues of material fact, we find the trial court did not err in granting Caveator's motion for summary judgment on the issue of *devisavit vel non*.

**IN RE WILL OF JONES**

[188 N.C. App. 1 (2008)]

## IV.

Propounder lastly argues the trial court erred in denying a stay pending appeal. As Propounder has cited no authority in support of this argument, we find this argument to be abandoned. N.C. R. App. P. 28(b)(6) (2005).

Upon thoughtful review of the record and the arguments presented by the parties, we conclude the trial court did not err in granting summary judgment on the issues of undue influence, testamentary capacity, and *devisavit vel non*. Further, despite Propounder's claims, we find no evidence to suggest the trial court granted summary judgment on grounds other than those specified in Caveator's motion for summary judgment. Therefore, we discern no error in the trial court's order granting summary judgment to Caveator.

Affirmed.

Judges GEER concurs.

Judge STROUD concurs in part and dissents in part in separate opinion.

STROUD, Judge, concurring in part and dissenting in part.

I concur with the holding of the majority opinion as to the denial of propounder's motion to dismiss and agree that propounder, the named executor under the March will, was an aggrieved party with standing to appeal the trial court's order denying probate of the March will. I also concur with the majority opinion in its holding that summary judgment was properly granted for Ms. Jones on the issue of the testamentary capacity of Mr. Jones. However, I respectfully dissent as to the majority's holding regarding the grant of summary judgment to caveator, Jean Jones ("Ms. Jones"), against the propounder, Joseph B. McLeod ("McLeod"), on the issue of undue influence by Ms. Jones.[1] I would therefore reverse the order of the trial court granting summary judgment for Ms. Jones on the issue of undue influence and *devisavit vel non* and remand for trial on the issues of undue influence and *devisavit vel non*.

---

1. For clarity, I will use the names of the parties in the analysis rather than the terms propounder and caveator. Mr. McLeod is the propounder of the March will, but would be the caveator of the September will. Ms. Jones is the caveator of the March will, but would be the propounder of the September will. Undue influence is alleged only as to the September will.

**IN RE WILL OF JONES**

[188 N.C. App. 1 (2008)]

"In ruling on a motion for summary judgment, the trial judge does not decide issues of fact but merely determines whether a genuine issue of fact exists." *Griffin v. Baucom*, 74 N.C. App. 282, 284, 328 S.E.2d 38, 40, *disc. review denied*, 314 N.C. 115, 332 S.E.2d 481 (1985). "The party moving for summary judgment has the burden of establishing the lack of any triable issue." *Purvis v. Moses H. Cone Mem'l Hosp. Serv. Corp.*, 175 N.C. App. 474, 477, 624 S.E.2d 380, 383 (2006). On a motion for summary judgment, neither this Court nor the trial court may resolve issues of fact and the motion must be denied if there is a genuine issue as to any material fact. *Caldwell v. Deese*, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975).

In ruling on a motion for summary judgment, "the evidence is viewed in the light most favorable to the non-moving party, and all inferences of fact must be drawn against the movant and in favor of the nonmovant." *Koenig v. Town of Kure Beach*, 178 N.C. App. 500, 503, 631 S.E.2d 884, 887 (2006) (citations and quotations omitted). The standard of review for summary judgment is *de novo. Builders Mut. Ins. Co. v. North Main Constr., Ltd.*, 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006).

"[W]hether [a party] unduly influenced decedent in the execution of the Will [is a] material question[] of fact." *In re Will of Smith*, 158 N.C. App. 722, 727, 582 S.E.2d 356, 360 (2003).

> [T]he burden of proving undue influence is on the caveator and he must present sufficient evidence to make out a *prima facie* case in order to take the case to the jury. The test for determining the sufficiency of the evidence of undue influence is usually stated as follows: it is generally proved by a number of facts, each one of which, standing alone, may have little weight, but taken collectively may satisfy a rational mind of its existence.

*In re Andrews*, 299 N.C. 52, 55, 261 S.E.2d 198, 200 (1980) (internal citations, brackets, and quotations omitted).

Our Supreme Court has listed seven factors to be considered in deciding the issue of undue influence in the execution of a will:

1. Old age and physical and mental weakness.

2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.

3. That others have little or no opportunity to see him.

4. That the will is different from and revokes a prior will.

5. That it is made in favor of one with whom there are no ties of blood.

6. That it disinherits the natural objects of his bounty.

7. That the beneficiary has procured its execution.

*Id.* (citation and quotation omitted).

This list of factors "does not purport to contain all facts and circumstances which might suggest the existence of undue influence, and the caveator need not prove the existence of every factor." *In re Estate of Forrest*, 66 N.C. App. 222, 225, 311 S.E.2d 341, 343, *aff'd*, 311 N.C. 298, 316 S.E.2d 55 (1984).

In the case *sub judice*, we must view the evidence in the light most favorable to McLeod, the non-moving party, and draw all reasonable inferences from the evidence in his favor. *Koenig*, 178 N.C. App. at 503, 631 S.E.2d at 887; *In re Andrews*, 299 N.C. at 56, 261 S.E.2d at 200-01 (viewing the evidence in the light most favorable to the caveator when the propounder moved for directed verdict on the issue of undue influence). In the case cited by the majority for the list of factors which are probative on the issue of undue influence, *Hardee v. Hardee*, 309 N.C. 753, 309 S.E.2d 243 (1983), our Supreme Court noted "defendants presented evidence that [the deceased] was alert and aware of what he was doing on the day the deed was executed and had the mental capacity to know and understand the nature and effect of his executing the deed," *Hardee*, 309 N.C. at 758, 309 S.E.2d at 246, but considered only "[e]vidence in this case favorable to the plaintiff," *Id.* at 757, 309 S.E.2d at 246, in concluding the evidence was sufficient to submit the case to the jury. *Id.* at 759, 309 S.E.2d at 247.

Viewed in the light most favorable to McLeod, the evidence tends to prove that the testator was suffering from a terminal illness which included mental weakness related to "multiple lesions in his brain compatible with metastatic disease" as of 1 August 2005. On 28 July 2005, his doctor noted that he was "profoundly weak and confused." Mr. Jones did not know where he was, what month it was, the year, or the name of the president. Dr. Nelson noted that Mr. Jones was "confused and [was] unable to make decisions" and that Ms. Jones was serving as his "surrogate-decision maker." Mr. Jones' medical and

prescription medication records indicate that during August and September he was taking multiple pain medications, including methadone and hydrocodone, medications which can "affect a patient's thinking."

McLeod's evidence shows that the testator was confined in the home with Ms. Jones, due to his illness, and subject to "near constant association and supervision." Although other people did see the testator at times, McLeod also presented evidence that at times Ms. Jones limited contact between Mr. Jones and others, even intercepting his phone calls. Some of Mr. Jones' friends who did see him during August and September of 2005 noted that his mental ability declined in this time period and that he talked little during visits. His "attitude and personality were greatly changed" and "his spirit was gone and all of the fight was out of him by that point." At the end of August 2005, Wayne Sinclair, a friend who had witnessed Mr. Jones' March will, visited with Mr. Jones. As he was leaving, Ms. Jones told Mr. Sinclair that the March will which he had witnessed was "totally wrong" because it did not provide enough for her and that she was "going to have somebody look into a new will." Mr. Sinclair told Ms. Jones that he did not read the March will so he did not know its terms, but Mr. Jones had told him that "it was exactly what he wanted." The evidence is undisputed that the September will is different from and revokes the March will, and in addition, changes the general testamentary plan that the testator had since as far back as 1992.

The majority opinion addresses only the first four of the *Andrews* factors which can apply to this case but fails to address the seventh factor as listed in *Andrews*, specifically 'that the beneficiary has procured [the will's] execution." However, McLeod's evidence indicates that Ms. Jones vigorously procured the execution of the September will. The affidavit of Michael Batts, the attorney who prepared the testator's March will, sets out in detail his communications with Ms. Jones and Mr. Jones regarding drafting a new will. On 5 August 2005, after talking with both Mr. and Ms. Jones together, Mr. Batts asked Ms. Jones to leave so that he could talk to Mr. Jones privately about his will. Ms. Jones left the room, but when Mr. Batts and Mr. Jones completed their conversation and called Ms. Jones back to the room, she repeatedly insisted that she needed to know what they had discussed. Mr. Batts also realized when Ms. Jones returned to the room that Ms. Jones had been able to listen to his conversation with Mr. Jones over a baby monitor in Mr. Jones' room. After Mr. Batts' "pri-

vate" conversation with Mr. Jones about his will, Ms. Jones followed Mr. Batts out of the house and reiterated her ideas regarding the new will: a simple will, leaving everything to her, and with her as executrix, since she did not need any help administering the estate.

When Mr. Batts mentioned the "possibility of a Will contest as the reason for being very careful" regarding the new will, Ms. Jones told him that she was not worried because she did not think that the employees (the remainder beneficiaries of the trust) even knew about Mr. Jones' March Will and Trust. When Mr. Batts told Ms. Jones that he was pretty sure that they did know, since he had some communications with them about the March Will and Trust, she said that Mr. Jones should never have told them about it, that she did not think they would contest the new will, and if they did, "she would just fire them." Ms. Jones also mentioned to Mr. Batts that Mr. Jones had an affair in 2001 that had "messed up his mind" and that he had changed his will after the affair. The context of her remark about Mr. Jones' prior affair was her statement that she had been "stepped on for too long and was now going to fight for what was hers." She also informed Mr. Batts that "her lawyers had told her that Buck's Will wouldn't have worked anyway, because she would have been able to contest it and get one-half of the company." On 23 August 2005, Mr. Batts noted his concerns that Ms. Jones "is pushing so hard [for the new Will] that he [could not] believe it's [Mr. Jones'] idea." Mr. Batts' concerns were based both upon his knowledge of Mr. Jones' desires in March 2005 to balance benefit to his employees with provision for his wife, as well has his personal observations of and conversations with both Mr. and Ms. Jones in August 2005. Mr. Batts' notes summarized his concerns regarding undue influence as follows: "She's worn him out—with him all day—he's tired—dependent—plans to change 'when he gets better'—she called us about his desire to change—won't leave the room, insists on knowing everything said between them—have told them this is asking for a will contest."[2] On Thursday, 25 August 2005, Mr. Batts called Ms. Jones to inform her of his decision not to prepare a new will for Mr. Jones. Mr. Batts' refused to prepare a new will for Mr. Jones based upon his "opinion that the

2. Mr. Batts' note that Mr. Jones "plans to change 'when he gets better' " refers to Mr. Jones' comment that he would "just do what she wants and after I get back on my feet I'll take a look at it again and make sure it's what I want to do." This statement and other evidence indicates that Mr. Jones was at times in a state of denial as to the terminal nature of his illness and that he had an irrational belief that he would have a chance to change his will again after his recovery. At other times he said that Mr. Batts "should just do the Will the way that Jean wanted it" and he did not really care what his will provided because he would be gone and it would not be his problem."

proposed changes to Mr. Jones' March 3, 2005 Will and Trust were actually the desires of Jean Jones, and due to the action of Jean Jones and her insistence in being involved in the proposed changes [he] was unable to determine if the proposed changes were also the desire of Mr. Jones and if he would be signing a new Will and Trust as a free and voluntary act free from any constraint or undue influence." Upon Mr. Batts' refusal to prepare the new will, Ms. Jones immediately sought out another attorney who had not represented the testator previously regarding estate planning issues and thus may have less suspicion regarding her motives. Exactly one week after Mr. Batts refused to prepare the new will, on 1 September 2005, Mr. Jones executed the September will.

McLeod presented evidence as to each of the five *Andrews* factors which could potentially apply to support a claim of undue influence in this case (as Ms. Jones was the testator's wife and a natural object of his bounty). Although it is not necessary that McLeod produce evidence to support every possible factor which could indicate undue influence, McLeod has done so, and all of the facts "taken collectively may satisfy a rational mind of" the existence of undue influence. *In re Estate of Forrest*, 66 N.C. App. at 225, 311 S.E.2d at 343 (citation omitted). McLeod's evidence, if viewed in the light most favorable to him, could establish that Ms. Jones exercised influence over the testator in such a way to substitute her desires for his as to the disposition of his estate.

Although the majority opinion discusses some of McLeod's evidence which would support a finding of undue influence based upon four of the *Andrews* factors, it places more emphasis upon Ms. Jones' evidence which would support a finding that Mr. Jones was not unduly influenced when he executed the September will. For example, the majority states that "Ms. Jones submitted evidence from a well-regarded attorney who prepared the will that the attorney gave independent advice to Mr. Jones, with Ms. Jones not present, stressing that the will had to be consistent with Mr. Jones' wishes." However, if we view the evidence in the light most favorable to the non-moving party, McLeod, we see that another well-regarded attorney, who had previously represented Mr. Jones on his estate planning issues, after extensive consultation with Mr. Jones, refused to prepare a new will for Mr. Jones because of his detailed and well-documented concerns regarding undue influence by Ms. Jones. It is not proper for us to accept as true Ms. Jones' evidence which contradicts McLeod's evidence for purposes of summary judgment.

Determining the credibility of the various witnesses—even the two "well-regarded" attorneys—and the weight to give to the evidence is the province of the jury. *In re Will of Jarvis*, 334 N.C. 140, 143, 430 S.E.2d 922, 923 (1993). Even if Ms. Jones has produced substantial evidence contradicting McLeod's evidence, her forecast of evidence cannot eliminate the dispute as to genuine issues of material fact. *Hayes v. Turner*, 98 N.C. App. 451, 457, 391 S.E.2d 513, 517 (1990). Because there is a dispute as to the material facts regarding undue influence, and Ms. Jones is not entitled to summary judgment as a matter of law, "the undue influence issue should have been placed before a jury." *Id.*

Because I would reverse the trial court's order granting summary judgment as to undue influence, I would also reverse the trial court's order granting summary judgment on the issue of *devisavit vel non*. Accordingly, I respectfully dissent on these issues.