IN THE MATTER OF THE ESTATE OF MOIRA P. McINTOSH
No. COA08-638
Court of Appeals of North Carolina
Filed April 7, 2009
This case not for publication
Mason & Mason, P.A., by L. Patten Mason, for Caveator-Appellant.
Harvell and Collins, P.A., by Wesley A. Collins, for Propounder-Appellee.
Ervin, Judge.
Caveator appeals from a portion of an order entered 21 August 2007 granting partial summary judgment with respect to the issue of testamentary capacity and Propounder appeals from another portion of the same order declining to grant summary judgment with respect to the issue of undue influence. We affirm in part and reverse in part.
Moira P. McIntosh (McIntosh) died at age 82 on 14 October 2004 from complications stemming from congestive heart failure, chronic obstructive pulmonary disease and depression. Two days before her death, McIntosh signed a will leaving her entire estate to her daughter, Eleanor Fulcher (Propounder), who had lived with McIntosh for approximately three years before her death. McIntosh's son, James B. Lawrence, Jr. (Caveator), was not named as a beneficiary in the will or in an earlier will executed on 2 September 1991.
Caveator filed a caveat challenging the 12 October 2004 will. After discovery was conducted, Propounder moved for summary judgment on the issues of testamentary capacity and undue influence. On 8 February 2008, the trial court entered an order granting Propounder's motion with respect to the testamentary capacity issue and denying Propounder's motion with respect to the undue influence issue. Both Caveator and Propounder appeal from the order entered by the trial court.[1]
Summary judgment is appropriate where there is no genuine issue of material fact and where the movant is entitled to judgment as a matter of law. See Kessing v. Mortgage Corp., 278 N.C. 523, 180 S.E.2d 823 (1971). According to established law, we review the record in the light most favorable to the nonmovant. See Caldwell v. Deese, 288 N.C. 375, 218 S.E.2d 379 (1975).

Testamentary Capacity
An individual possesses the capacity to make a valid will if "[She] (1) comprehends the natural objects of [her] bounty, (2) understands the kind, nature and extent of [her] property, (3) knows the manner in which [she] desires [her] act to take effect, and (4) realizes the effect [her] act will have upon [her] estate." In re Will of Jarvis, 334 N.C. 140, 145, 430 S.E.2d 922, 925 (1993). "[A] presumption exists that every individual has the requisite capacity to make a will, and those challenging the will bear the burden of proving, by the greater weight of the evidence, that such capacity was wanting." In re Will of Sechrest, 140 N.C. App. 464, 473, 537 S.E.2d 511, 517 (2000). However, to establish a lack of testamentary capacity, a caveator need only show that one of the essential elements of testamentary capacity is lacking. In re Will of Kemp, 234 N.C. 495, 499, 67 S.E.2d 672, 675 (1951); see also In re Will of Shute, 251 N.C. 697, 699, 111 S.E.2d 851, 853 (1960) ("If all of the elements of testamentary capacity are essential to make or revoke a will, obviously the lack of any one of them renders the testator incapable of performing such act"). As a result, in order to prove lack of testamentary capacity, the caveator must "present specific evidence relating to testat[rix's] understanding of [her] property, to whom [she] wished to give it, and the effect of [her] act in making a will at the time the will was made." In re Will of Buck, 130 N.C. App. 408, 413, 503 S.E.2d 126, 130 (1998). "[G]eneral testimony concerning testat[rix's] deteriorating physical health and mental confusion in the months preceding the execution of the will" does not suffice to show the absence of sufficient mental capacity to make a valid will. Will of Buck, 130 N.C. App. at 413, 503 S.E.2d at 130; see also In re Will of Smith, 158 N.C. App. 722, 725, 582 S.E.2d 356, 359 (2003); In re Estate of Whitaker, 144 N.C. App. 295, 298, 547 S.E.2d 853, 857 (2001). "[However], evidence of incapacity within a reasonable time before and after is relevant and admissible insofar as it tends to show mental condition at the time of execution of the will." In re Coley, 53 N.C. App. 318, 324, 280 S.E.2d 770, 773 (1981) (citation omitted).
The Caveator contends that evidence in the record suffices to support a jury conclusion that McIntosh lacked sufficient testamentary capacity to make a valid will on 12 October 2004. Ms. Tracy Pigott (Pigott), Propounder's daughter, signed an affidavit in which she indicated that at the time that McIntosh executed a deed of trust securing a loan on the family residence in June 2004, she heard McIntosh ask "on three separate occasions, `What am I signing?'" In addition, Pigott stated that she was present when Mr. Wheatly "came to my Grandmother's house . . . about my Grandmother signing a will." Pigott stated that "[o]n the day that Mr. Wheatly was at my Grandmother's house, when I came in, I looked at my Grandmother and she was just staring into space."[2] In addition, Caveator stated in his own affidavit that he had "visited [McIntosh] on numerous occasions throughout the years and observed both her health and mental condition declining." According to Caveator, McIntosh "was very ill and depressed" "during 2004" and "was not fully in touch with reality." "In talking with [McIntosh] during the year 2004 and observing her in general, she would not remember anything that [Caveator] told her and repeatedly asked the same question over and over again." McIntosh "told me on one occasion that she had built my house when she had nothing to do with the construction or financing of my house." He further stated that, in 2003, "my mother gave my children checks for Christmas presents and these checks bounced and were returned for insufficient funds." Caveator asked McIntosh "why she had mortgaged her house" in August 2004. However, McIntosh "never gave me an answer but looked at [Propounder] each time I asked this question." He then stated that, "[i]n my opinion, my mother did not know that she had mortgaged her house." According to Caveator, McIntosh did not know "what she owned or how much money she had" during 2004. "At the time of [McIntosh's] death, Caveator said that "she was 84 years of age and was severely, physically limited and was mentally weak." All of this testimony was relevant on the issue of whether McIntosh possessed the mental capacity to make a will.
We believe that the record discloses the existence of a genuine issue of material fact as to whether McIntosh understood the kind, nature and extent of her property. When taken in the light most favorable to the Caveator, the forecasted evidence shows that McIntosh was in a period of generally declining physical and mental health, that McIntosh had claimed in 2004 to have made payments for the use and benefit of Caveator when no such payments had actually been made, that checks given by McIntosh to Caveator's children for Christmas in 2003 were not supported by sufficient funds, that McIntosh expressed confusion about the nature of a loan transaction in which she participated approximately four months prior to the execution of the disputed will, that McIntosh was unable to explain why she had used her residence to secure this loan or even understand that she had mortgaged her house, and that McIntosh was seen simply staring off into space on the date that she executed the disputed will. The evidence forecast by the Caveator, if believed, would suffice to establish repeated instances, beginning at least a year before the date upon which the disputed will was executed, in which McIntosh demonstrated a lack of understanding of the nature and extent of her property. The evidence forecast by the Caveator establishes more than the attempt to devise property not owned by the testator at issue in In re Will of Harrington, 252 N.C. 105, 113 S.E.2d 21 (1960); the limited number of instances of confusion coupled with generally declining physical and mental health at issue in In re Will of Jones, 188 N.C. App. 1, 655 S.E.2d 407 (2008), rev'd on other grounds, 362 N.C. 569, 669 S.E.2d 572 (2008); the evidence of occasional drunkenness and periodic math errors at issue in Will of Sechrest, 140 N.C. App. 464, 537 S.E.2d 511; and the instances of forgetting what the testator owned coupled with generally declining physical and mental health at issue in Will of Buck, 130 N.C. App. 408, 503 S.E.2d 126. Instead, the evidence forecast by Caveator more closely resembles the repeated instances in which the testator failed to understand the nature and extent of his property at issue in Will of Jarvis, 334 N.C. 140, 430 S.E.2d 922. "Whether caveator['s] witnesses were credible and whether the evidence, viewed in the light most favorable to caveator[], was sufficient to rebut the presumption of [McIntosh's] testamentary capacity, were questions for the jury[.]" Will of Jarvis, 334 N.C. at 147, 430 S.E.2d at 925. Because there is a genuine issue of material fact as to whether McIntosh understood the nature and extent of her property, thus casting into doubt whether she had the mental capacity necessary to make a valid will, we hold that it was error for the trial court to grant Propounder's motion for summary judgment relating to the testamentary capacity issue.

Undue Influence:
We now must determine whether Caveator forecast sufficient evidence that the 12 October 2004 will resulted from undue influence to overcome Propounder's motion for summary judgment. We conclude that he did.
The first issue we must address is whether the Propounder has properly perfected her appeal from the trial court's order concerning the undue influence issue. The record indicates that, within the time limitations specified by N.C.R. App. P. 3(c), the Propounder noted an appeal from that portion of the trial court's order that declined to grant summary judgment in her favor with respect to the undue influence issue. The filing of a separate notice of appeal was the proper method to attempt to present the undue influence issue for consideration by this Court, since the trial court's ruling on that issue did not constitute "an alternative basis in law for supporting the judgment, order or other determination from which appeal has been taken." N.C.R. App. P. 10(d). The Propounder did not, however, file a separate appellant's brief as required by N.C.R. App. P. 13(a)(1). Instead, she incorporated her challenge to the trial court's ruling on the undue influence issue in the appellee's brief that she filed pursuant to N.C.R. App. P. 13(a). Although the Propounder could have appropriately adopted this approach in the event that the undue influence issue was properly presented pursuant to N.C.R. App. P. 10(d), that issue constitutes a second challenge to the trial court's order rather than an alternative basis for upholding it. As a result, the Propounder has not properly preserved her challenge to the undue influence issue for purposes of appeal. Propounder's method of proceeding effectively deprived the Caveator of the right to file a brief addressing the Propounder's challenge to the trial court's ruling on the undue influence issue. N.C.R. App. P. 28(h) (allowing reply briefs only in the event that the Court orders the filing of such briefs ex mero motu, in response to arguments advanced in the appellee's brief pursuant to N.C.R. App. P. 10(d), or in the event that the Court notifies the parties that no oral argument will be held). However, given the absence of prejudice to the Caveator resulting from the Court's disposition of the undue influence issue and the additional clarity that our ruling will provide on remand, we elect to address the undue influence issue on the merits. N.C.R. App. P. 2; see also Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co., 362 N.C. 191, 201, 657 S.E.2d 361, 366 (2008) (stating that if this Court determines that the degree of a party's noncompliance with nonjurisdictional requirements warrants dismissal of the appeal under N.C.R App. P. 34(b), it may consider invoking Rule 2 "[t]o prevent manifest injustice to a party, or to expedite decision in the public interest)." "[A]n appellate court has a strong preference for deciding cases on their merits; and it is the task of an appellate court to resolve appeals on the merits if at all possible[.]" Dogwood Dev. & Mgmt. Co., 362 N.C. at 201, 657 S.E.2d at 366 (quoting 5 Am. Jur. 2d Appellate Review § 804, at 540 (2007)).
Our Supreme Court has defined "undue influence" as:
[S]omething operating upon the mind of the person whose act is called in judgment, of sufficient controlling effect to destroy free agency and to render the instrument, brought in question, not properly an expression of the wishes of the maker, but rather the expression of the will of another. "It is the substitution of the mind of the person exercising the influence for the mind of the testator, causing him to make a will which he otherwise would not have made.
In short, undue influence, which justifies the setting aside of a will, is a fraudulent influence, or such an overpowering influence as amounts to a legal wrong. It is close akin to coercion produced by importunity, or by a silent, resistless power, exercised by the strong over the weak, which could not be resisted, so that the end reached is tantamount to the effect produced by the use of fear or force.
Will of Jones, 362 N.C. at 573, 669 S.E.2d at 576 (quoting In re Will of Turnage, 208 N.C. 130, 131-32, 179 S.E. 332, 333 (1935)). Undue influence requires "more than mere influence or persuasion because a person can be influenced to perform an act that is nevertheless his voluntary action," In re Will of Andrews, 299 N.C. 52, 53, 261 S.E.2d 198, 199 (1980) (citation omitted), and does not require "moral turpitude or even a bad or improper motive," In re Will of Craven, 169 N.C. 561, 568, 86 S.E. 587, 591 (1915).
It is impossible to set forth all the various combinations of facts and circumstances that are sufficient to make out a case of undue influence because the possibilities are as limitless as the imagination of the adroit and the cunning. The very nature of undue influence makes it impossible for the law to lay down tests to determine its existence with mathematical certainty.
Will of Andrews, 299 N.C. at 54-55, 261 S.E.2d at 200 (1980). Nevertheless, our Supreme Court has identified several factors that often support a finding of undue influence:
1. Old age and physical and mental weakness;
2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision;
3. That others have little or no opportunity to see him;
4. That the will is different from and revokes a prior will;
5. That it is made in favor of one with whom there are no ties of blood;
6. That it disinherits the natural objects of his bounty;
7. That the beneficiary has procured its execution.
Will of Andrews, 299 N.C. at 55, 261 S.E.2d at 200. A caveator need not demonstrate the existence of every factor named in Andrews in order to prove undue influence. See In re Estate of Forrest, 66 N.C. App. 222, 225, 311 S.E.2d 341, 343 (1984). "[U]ndue influence is generally proved by a number of facts, each one of which standing alone may be of little weight, but taken collectively may satisfy a rational mind of its existence." Hardee v. Hardee, 309 N.C. 753, 757, 309 S.E.2d 243, 246 (1983) (citation and quotation marks omitted). If a reasonable mind could infer from such evidence that the purported last will and testament is not the product of the testator's "free and unconstrained act," but is rather the result of "overpowering influence . . . sufficient to overcome [the] testator's free will and agency," then "the case must be submitted to the jury for its decision." Will of Andrews, 299 N.C. at 56, 261 S.E.2d at 200. Here, the record contains conflicting evidence on the question of undue influence. However, the record does contain substantial evidence that would be sufficient, if believed, to establish that the 12 October 2004 will resulted from undue influence. For example, Pigott signed an affidavit stating that she was present when Mr. Wheatly "came to my Grandmother's house . . . about my Grandmother signing a will" and that, "when I came in, I looked at my Grandmother and she was just staring into space." Furthermore, Pigott's affidavit provides information regarding a deed of trust executed on 29 July 2004 that used McIntosh's home to secure a $60,000 loan, the bulk of which went to Propounder. Pigott stated that Propounder "put the papers in front of my Grandmother for her to sign. My Grandmother said on three separate occasions, `What am I signing?'" Propounder finally said to McIntosh, "Mama just sign this[,]" and at that point, McIntosh signed the deed of trust. Then, according to Pigott's affidavit, Propounder "took the papers to [her son] and said, `Sign your Grandfather's name. Don't sign it in your handwriting. Sign it differently than you normally do.'"
The affidavit of Caveator states that "I know that [McIntosh's husband] did not sign this Deed of Trust and that [Propounder] had his signature forged. I also know that most of the money for this loan went to [Propounder] and not to my Mother and Stepfather." Caveator states that "during 2004, my mother was very ill and depressed. In my opinion, she was not fully in touch with reality[.]" Caveator continued: In talking with my mother during the year 2004 and observing her in general, she would not remember anything that I told her and repeatedly asked the same questions over and over again. I asked my Mother why she had mortgaged her house. She never gave me an answer but looked at [Propounder] each time I asked this question. This was in August, 2004. In my opinion, my mother did not know that she had mortgaged her house. My Mother was in the hospital for approximately one week before her death the following week. It was during the week after she got out of the hospital that my sister, [Propounder], had her sign the Will that is the subject of this Caveat. During 2004, I do not believe that my mother knew what she owned or how much money that she had. At the time of my mother's death, she was 84 years of age and was severely, physically limited and was mentally weak. My sister [Propounder], lived in the home with my mother and my mother was dependent upon [Propounder] to look after and care for her. My sister [Propounder], prohibited me from going to the house to visit with my mother.
When we view the foregoing evidence in light of the factors enunciated in Andrews and taking that evidence in the light most favorable to the Caveator, the evidence tends to show the existence of several of the factors typically considered in evaluating undue influence claims: old age and physical and mental weakness; that the person signing the paper is in the home of the beneficiary and subject to her constant association and supervision; that others have little or no opportunity to see her; that the will disinherits one of the natural objects of her bounty, her son; and that the beneficiary has procured the will's execution. However, we also note that the evidence forecast by Propounder, if believed, would be adequate to permit a jury to conclude that there was no undue influence in the signing of the will in question. Considering the evidence in the light most favorable to the Caveator, there are genuine issues of material fact as to whether Propounder unduly influenced McIntosh in the signing of the will in question. As a result, we hold that the trial court correctly denied Propounder's motion for summary judgment concerning the undue influence issue. This assignment of error is overruled.
For the foregoing reasons, we reverse and remand the trial court's order granting summary judgment with regard to McIntosh's testamentary capacity and affirm the trial court's order with regard to undue influence.
REVERSED AND REMANDED in part; AFFIRMED in part.
Judges WYNN and HUNTER, Robert C. concur.
Report per Rule 30(e).
NOTES
[1] Preliminarily, we note that the trial court stated in its order that it "certifies that this order affects substantial rights of the parties and there is no just reason to delay an appeal." See N.C. Gen. Stat. § 1A-1, Rule 54(b) (2007). See DKH Corp. v. Rankin-Patterson Oil Co., 348 N.C. 583, 585, 500 S.E.2d 666, 667 (1998) (stating that "Rule 54(b) provides that in an action with multiple parties or multiple claims, if the trial court enters a final judgment as to a party or a claim and certifies there is no just reason for delay, the judgment is immediately appealable"). The trial court's order here constitutes a final decision with respect to the testamentary capacity issue. Furthermore, the order here affects a substantial right. See also Vaughan v. Moore, 89 N.C. App. 566, 567-568, 366 S.E.2d 518, 519-520 (1988) (citing Olive v. Great American Ins. Co., 76 N.C. App. 180, 333 S.E.2d 41, disc. rev. denied, 314 N.C. 668, 336 S.E.2d 400 (1985) (holding that a substantial right was affected when the court granted partial summary judgment regarding the plaintiff's second and third claims, although the plaintiff's first claim remained live, because plaintiff had a substantial right to have all of their factually related claims tried before the same judge and jury)).
[2] Admittedly, in a subsequent affidavit submitted by Propounder, Pigott repudiated the contents of her earlier Affidavit. More particularly, Pigott stated in her subsequent affidavit that "[t]he [former] Affidavit contains numerous statements that are not true, and are not my testimony;" that "I was under the influence of drugs at the time I . . . signed the Affidavit;'" and that "I am no longer under the influence of drugs." Even though the discrepancies in these two affidavits, both signed by Pigott, are startling, the Supreme Court has recently held that "discrepancies" between affidavits executed by the same individual "go to the weight and credibility of the evidence, which are questions for a jury and not for [the] Court." In re Will of Jones, 362 N.C. 569, 577-578, 669 S.E.2d 572, 579 (2008). As a result, we conclude that we must consider the information contained in Pigott's initial affidavit in determining the extent to which the trial court correctly granted summary judgment in favor of the Propounder on the testamentary capacity issue.