An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 24-876

Filed 18 June 2025

Durham County, No. 22-E-983

IN THE MATTER OF THE WILL OF RUTH EILEEN HOBGOOD

Appeal by caveator from order entered 11 April 2024 by Judge John M. Dunlow in Superior Court, Durham County. Heard in the Court of Appeals 20 May 2025.

*Mark L. Hayes, for caveator-appellant.*

*RHD Legal, by Robert S. Shields Jr., for propounders-appellees.*

ARROWOOD, Judge.

Donna Neblett ("caveator") appeals from an order granting summary judgment in favor of Bess T. Parham ("Ms. Parham"), Robert Parham ("Mr. Parham"), Steven Ray Ellington, Jr. ("Mr. Ellington, Jr."), and Natalie E. Long ("Ms. Long") (collectively "propounders") and dismissing the caveat to the will of Ruth Eileen Hobgood ("testator"). For the following reasons, we affirm the order of the trial court.

## I. Factual Background

This case arises from caveator's allegations of undue influence exercised over

testator by Ms. Parham, the close friend of caveator's now-deceased sister, Patricia Ellington ("Ms. Ellington")[1] and the changes to testator's will in favor of propounders which caveator alleges were the result of this influence. The record and evidence tended to show the following.

Caveator and Ms. Ellington came to North Carolina in 1963, where they met Ms. Parham in elementary school, Ms. Ellington and Ms. Parham becoming "fast friends." The sisters spent the majority of their non-school days with their aunt, the testator, among other relatives. Testator had no children of her own, and until 1969 worked for General Motors. The relationships between testator, caveator, Ms. Ellington and Ms. Parham remained positive over the next few decades.

Caveator testified that in 2003, she received an uncharacteristic phone call from testator, who allegedly screamed at her over testator's misbelief that caveator had lost her home due to some irresponsibility. The same year, testator placed her brother in a special care facility and began living on her own for the first time, making her "irritable and unhappy," according to caveator. When testator's brother died the next year, she appeared to develop serious depression.

In 2004, testator created her first will ("Will I"), which caveator believed was at the behest of Ms. Ellington to help secure her future. Caveator also stated that she believed there was a will prior to Will I which divided testator's estate equally

---

[1] Propounders Mr. Ellington Jr. and Ms. Long are Ms. Ellington's children.

between the sisters, although she has produced no evidence of the existence of this will. Will I devised all of testator's property to Ms. Ellington, with Mr. Ellington Jr. and Ms. Long as successors in interest, with no references to or interests devised to caveator. Ms. Ellington developed breast cancer soon after the creation of Will I, and Ms. Parham often accompanied her to her oncology appointments.

Caveator testified that testator exhibited odd and concerning behavior between 2004 and 2007. She called caveator several times over the course of a year about missing items which turned out to have been misplaced; she acted defiant and screamed at a waiter after not being provided a "doggie bag" while out to eat with caveator; and angrily refused caveator's requests to live with her in Raleigh and go on a beach vacation. In 2007, testator moved to an assisted living community, Croasdaile, in Durham; this same year Ms. Ellington's cancer returned.

According to Ms. Long's testimony, "all hell broke loose" in the fall of 2010. According to Ms. Long, caveator went on a "war path" that involved telling Ms. Ellington she would "hunt her down," then telling Ms. Long, "You are next." Ms. Long sought a restraining order against caveator the next day. Caveator denied threating either testator or Ms. Long, but could not remember if she contested the restraining order in court, which was ultimately granted.

Ms. Ellington died on 26 May 2011. On 8 July 2011, testator created her second will ("Will II") in the presence of testator's attorney William Browning ("Mr. Browning"), which devised the entirety of her estate to Ms. Parham, with Mr.

Ellington Jr. and Ms. Long as successors. Ms. Parham reported that on this day, testator told her "that she was going to make a change to her will, but she did not tell me how she was going to change it." Testator changed her will again ("Will III") two weeks later, on 21 July 2011, where she removed Ms. Long and Mr. Ellington Jr. as successor heirs and replaced them with Ms. Parham's husband, Mr. Parham. Ms. Parham stated that she drove testator to one of these appointments, but could not remember which. Caveator was not mentioned nor received any divisions in either Will II or Will III.

At some point after the creation of Will II, caveator's husband visited testator. The parties dispute what occurred during the visit, but caveator sent testator a letter after the meeting that discussed some of the details. In this letter, caveator states that testator has been "influenced by others," and wrote that if her husband had slammed a door during the meeting, it was "only out of exasperation because you continue to allow yourself to be used." The letter accused testator of betrayal, and referred to testator's decision to sit with Ms. Parham at Ms. Ellington's funeral, rather than caveator, as a "kick in the ass."

During this period, testator continued to suffer from depression and anxiety. The first mention of anxiety from the medical records provided was 10 October 2006. At this time she was taking medication for her anxiety. After moving to Croasdaile, she began visiting the clinic there; her anxiety and depression was noted frequently during these appointments. However, the visit notes consistently indicated a sound

mind: on 9 March 2011, she was reported to have "no problems with memory or thinking" and that she drove a car; on 16 May 2012, she was reported to still be driving without accidents or getting lost. In 2013 she was described as a "delightful, well spoken" woman after a Duke Health appointment. Caveator stated that during the period of July 2006 to July 2011, she visited testator twice a month and would talk with her on the phone weekly.

On 20 April 2012, testator created a holographic codicil to her will ("Will III codicil") which divided her estate equally amongst Ms. and Mr. Parham, Mr. Ellington, Jr., and Ms. Long, apart from a sum of $10.00 devised to caveator. Ms. Parham stated that testator showed her the codicil, and she told testator that she needed to have it notarized and took testator to a notary in Croasdaile. In 2016, testator developed more acute memory problems, and her health continued to decline.

Testator died 26 June 2022, and her holographic codicil received a certificate of probate 5 August 2022. Caveator filed her caveat on 19 January 2023, alleging that both Will III and Will III codicil were the product of undue influence. Propounders filed their answer on 27 February 2023, which included the argument that caveator had failed to state a claim upon which relief could be granted. Propounders followed their response with a Rule 56 motion for summary judgment. A year of discovery followed, including the depositions of caveator and propounders, and affidavits from caveator, Ms. Parham, Ms. Long, two staff members from Croasdaile, and testator's attorney Mr. Browning.

Propounders' motion for summary judgment came on for hearing on 1 April 2024. On 11 April 2024, the trial court entered an order granting propounders' motion for summary judgment. Caveator gave notice of appeal 6 May 2024.

## II.   Discussion

Caveator raises one issue on appeal, that the trial court erred in granting the motion for summary judgment in favor of propounders. Caveator's argument consists of two parts: first, that propounders were unable to overcome the presumption of undue influence where a fiduciary relationship existed between testator and Ms. Parham through durable power of attorney and Ms. Parham received property under testator's final will; and second, even if propounders were able to shift the presumption, caveator pleaded sufficient facts related to undue influence to survive summary judgment. We disagree.

### A.   Standard of Review

"The standard of review on appeal for summary judgment is whether there is any genuine issue as to any material fact and whether the moving party is entitled to a judgment as a matter of law." *In re Will of Priddy*, 171 N.C. App. 395, 396 (2005) (citations and interior quotations removed). "In ruling on a motion for summary judgment, the court may consider the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Id.* at 396–97 (cleaned up). "All facts asserted by the adverse party are taken as true, and their

inferences must be viewed in the light most favorable to that party." *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (interior citations removed).

However, although we take all facts asserted as true, we will not give deference to "conclusory statements of opinion." *See In re Estate of Whitaker*, 144 N.C. App. 295, 299 (2001). Our review of summary judgment is *de novo*. *In re Will of Jones*, 362 N.C. 569, 573 (2008).

### B. Presumption of Undue Influence

Normally, the burden of proving undue influence rests on the caveator. *In re Andrew's Will*, 299 N.C. 52, 54 (1980). However, when parties are in certain fiduciary relationships, a transaction favoring the party wielding power over the other will be presumed the result of fraud or undue influence unless that presumption is rebutted with evidence that this was not the case. *In re Atkinson's Will*, 225 N.C. 526, 530 (1945). The particular nature of the fiduciary relationship is critical, since "an agent is a fiduciary only pertaining to matters within the scope of his agency." *In re Sechrest*, 140 N.C. App. 464, 472 (2000) (citation omitted). Consequently, a health care power of attorney, where it exists only for medical decisions, does not constitute a fiduciary relationship for purposes of the creation of a will. *Id.* Further, a fiduciary relationship will only exist if durable power of attorney has been granted prior to the execution of the contested will. *Id.* In *In re Sechrest*, this Court held that summary judgment was appropriately granted where a general power of attorney was executed contemporaneously with a will devising property to the general attorney-in-fact, as

there was no evidence that the attorney-in-fact was aware of the power of attorney or acted as such upon execution of the will. *Id.*

In the case *sub judice*, testator gave Ms. Parham durable power of attorney, with power to "operate and conduct all matters relating to [her] property and estate," on 8 July 2011. The same day, testator created Will II, which disinherited Ms. Ellington and instead passed testator's estate to Ms. Parham, with Ms. Ellington's children remaining as successors. Ms. Parham's affidavit, which was uncontradicted, states that the creation of Will II and this grant of power of attorney occurred at the same time. Although it appears that Ms. Parham was aware that she had been granted durable power of attorney, there is no evidence that she was acting as such at the time Will II was executed. Accordingly, there is no presumption of fraud as to Will II.

Furthermore, caveator has failed to show how Ms. Parham was benefitted by the creation of Will III and its codicil. Will III replaces Mr. Ellington Jr. and Ms. Long with Mr. Parham as the successor interest, and the codicil devised three equal shares between Mr. and Ms. Parham, Mr. Ellington Jr., and Ms. Long, and $10.00 to caveator, reducing the share given to Ms. Parham. Caveator cites to no case law nor presents any evidence that the changes to Will II constitute a benefit to Ms. Parham. Caveator notes correctly that the codicil elevated Mr. Parham from successor heir to primary heir, yet neglects to mention that this came at the expense of Ms. Parham herself. Since caveator has failed to demonstrate how Ms. Parham was benefitted in

her fiduciary relationship with testator, we hold that propounders had no burden to rebut an allegation of undue influence.

Assuming, *arguendo*, that Ms. Parham did benefit in some way from her relationship, she has produced sufficient evidence of open and honest dealing such that burden has shifted back to caveator. Both wills were signed in the presence of an attorney, and outside the presence of Ms. Parham. It is undisputed that, although Ms. Parham technically possessed testator's power of attorney, she did not act on testator's behalf until much later in testator's life, around 2020, similar to *In re Sechrest*.

The most significant change in the division of testator's estate occurred in the changes from Will I to Will II, changes which were made before any fiduciary relationship existed between Ms. Parham and testator. Testator's attorney, Mr. Browning, testified that she knew what she wanted to do when she created Wills II and III, and he was not aware that anyone was unduly influencing her. Mr. Browning also testified that he ensures that his clients understand the consequences of the choices they are making; if testator had any concerns about the will, she had the ability to consult with Mr. Browning outside the presence of Ms. Parham.

Regarding Ms. Parham's dealings with testator before she created the codicil, we note again that this change reduced Ms. Parham's share of the inheritance from what she would have received under the unchanged Will III, and included a devise to caveator, who had not been named in any of the previous wills. Testimony as to what

occurred between the creation of Will III and Will III codicil is sparse, but the evidence generally reflects that testator had a great degree of independence, was handling her financial affairs on her own including a checking account and stock investments through as late as December 2020, and frequently interacted with others in Croasdaile. Taken together, this is sufficient evidence to shift the burden of proving undue influence back to caveator.

### C. Requirements of Undue Influence

"There are four general elements of undue influence: (1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence." *Griffin v. Baucom*, 74 N.C. App. 282, 286 (1985). Undue influence is a fraudulent or overpowering influence, such that "the end reached is tantamount to the effect produced by the use of fear or force." *In re Turnage's Will*, 208 N.C. 130 (1935).

Because cases of undue influence contain permutations that "are as limitless as the imagination of the adroit and the cunning," our Supreme Court has provided general factors that might assist courts in determining whether undue influence has occurred:

> 1. Old age and physical and mental weakness;
> 2. that the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision;
> 3. that others have little or no opportunity to see him;
> 4. that the will is different from and revokes a prior will;
> 5. that it is made in favor of one with whom there are no

ties of blood;
6. that it disinherits the natural objects of his bounty;
7. that the beneficiary has procured its execution.

*In re Andrew's Will*, 299 N.C. at 54–55 (quoting *In re Mueller's Will*, 170 N.C. 28, 30 (1915)). This list is referred to in the parties' briefs as "the *Andrews* factors." While a party alleging undue influence "need not prove the existence of every factor," they must put forward enough evidence to substantiate a prima facie case. *In re Estate of Forrest*, 66 N.C. 222.

When applying the first factor to testator, we are unable to find any evidence or testimony presented by caveator that would indicate testator was an individual subject to influence, as required by *Griffin*. None of the medical records provided indicate any memory issues until 2016, well after the relevant period; in fact, the medical records paint a picture of an intelligent, capable woman. The uncontested testimony of Janice Seal, a staff member in Croasdaile from 2006 until 2013 who interacted with testator often, describes testator as having "a great sense of humor, laugh, and was a talented artist having painted many pictures she shared in the art gallery[,]" and was "mentally alert, and extremely sharp in her expressions and conversation." Caveator's attempts to depict testator as mentally fragile rely on isolated incidents of emotional outburst and references to testator misplacing and then finding items. It is uncontested that testator suffered from depression and anxiety to the point of requiring medication, yet caveator has failed to demonstrate how these conditions placed testator in a vulnerable state or otherwise show a lack of

mental acuity.

Regarding the second factor, it is uncontroverted that testator lived on her own in an assisted living facility, and did not live with Ms. Parham. She did not sign her will in Ms. Parham's home, but rather in her attorney's office. Caveator herself admits that Ms. Parham did not subject testator to constant association and supervision.

Caveator claims that others had no little or no opportunity to see testator, but this factor does not weigh in favor of caveator. Caveator, the very person challenging the will, admits that between July 2006 and July 2011 she had twice-monthly visits with testator, and called her weekly. Ms. Long described testator's living situation at Croasdaile as one where she was in close proximity to neighbors and staff that were frequently on hand.

Factors four and five both favor caveator, since Will III and Will III codicil revoked the wills prior, were different from prior wills, and provided for Ms. and Mr. Parham, to whom caveator was unrelated.

Factor six is less favorable to caveator; although Will III removed Mr. Ellington Jr. and Ms. Long as successors, they were elevated by the codicil to receive equal shares as heirs. Furthermore, there is a logical explanation evident within the record for testator's changes to the wills. It appears from the testimony in the record that testator may have developed an antipathy towards caveator, and at the same time considered Ms. Ellington as the daughter she never had. The record reflects that

caveator had become estranged from her family, sent harassing emails to family members over a long period of time, and was under a restraining order filed by Ms. Long following caveator's alleged statement that she would "hunt down and find" Ms. Ellington and that Ms. Long was "next." Caveator specifically antagonized Ms. Ellington prior to her death from cancer, and sent an angry email to testator for not sitting with her at Ms. Ellington's funeral. Ms. Ellington died on 16 May 2011, and testator shortly thereafter executed Will II and Will III. After the execution of Will II and the durable power of attorney, caveator's husband visited testator to express his anger that caveator had not been granted healthcare power of attorney by testator, apparently slamming a door hard enough to knock a picture off testator's wall. Ms. Parham stated at deposition that when she next saw testator, "her whole face was red, her eyes were red and swollen, where she had been crying so long," after caveator's husband upset her.

It is undisputed that Ms. Parham played a more active role in Ms. Ellington's life immediately prior to her death than did caveator. Testator may well have wished her will to reflect the role Ms. Parham played in her favorite niece's life, and to acknowledge the effects of caveator's behavior. Thus, while factors four through six include some facts favorable to caveator, they are unavailing when considered within the context of the case and the previous factors.

To support a finding that factor seven favors her, caveator cites instances of Ms. Parham's involvement with the creation of the wills which she argues constitutes

procurement. However, the only involvement Ms. Parham had with respect to the wills apparent from the record is that she told testator that she needed to include Ms. Ellington's children in her will, that she drove testator to testator's chosen attorney's office, and told testator that she needed to get the codicil notarized. There is no evidence that Ms. Parham had any interaction with the attorney, or was present when the will was discussed or drawn.

It is undisputed that Ms. Ellington gave Ms. Parham a copy of testator's 2004 will shortly before her death, and told Ms. Parham that she would "need it." Caveator takes this to support a contention that Ms. Parham "planned to involve herself in the new estate plan." However, caveator provides no further evidence of any collusion between Ms. Ellington and Ms. Parham. Given the nature of summary judgment, we accept caveator's fact of this handing over of the will as true, but we are not bound to accept caveator's theory as to why this occurred. On the other hand, there is an abundance of evidence that the caveator had become estranged from all the members of her family, even to the point of requiring them to obtain court orders because of her threats. Caveator's own testimony that her husband went and tried to bully testator is a final nail in the coffin.

In conclusion, the most important factor, the mental state of the testator, heavily favors propounders, as the undisputed evidence is that she suffered only mild memory issues, and was generally regarded as possessing an intelligent mind. This evidence is bolstered by the testimony of testator's attorney who drew the critical

documents.

This case presents nothing more than an attempt by a niece of the testator who, because of her own actions and the actions of her husband, had become estranged not only from the testator but from her own sister that the testator was close with, to such a degree that a court order was necessary to protect the sister and others from the caveator, who now seeks to overturn the will of her aunt with unsupported theories of undue influence. Caveator has presented no testamentary documents, apart from the codicil she now challenges, that identify caveator as a beneficiary of testator's estate, nor any other evidence that testator ever intended to do so. We find no support that would allow her to escape summary judgement.

### III. Conclusion

For the foregoing reasons, we affirm the order of the trial court.

AFFIRMED.

Chief Judge DILLON and Judge HAMPSON concur.

Report per Rule 30(e).