IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-160

No. COA21-351

Filed 15 March 2022

Carteret County, No. 18 CVS 864

In re the HERMAN EARL GODWIN REVOCABLE TRUST created under Agreement dated August 9, 2017

THERESA ANN GODWIN, Plaintiff,

v.

CECIL S. HARVELL, in his capacity as Executor of the Estate of Herman E. Godwin, in his capacity as Trustee of the Herman E. Godwin Revocable Trust created under Agreement dated August 9, 2017, in his capacity as Trustee of the trust f/b/o Aiden Gaffney created under ARTICLE IV of the Herman E. Godwin Revocable Trust Agreement dated August 9, 2017, in his capacity as Trustee of the trust f/b/o Zhoe Gaffney created under Article IV of the Herman E. Godwin Revocable Trust Agreement dated August 9, 2017; APRIL M. JONES; PAULA K. WOODY; HEATHER GAYLOR; and ZHOE GAFFNEY, Defendants

In the Matter of the Estate of HERMAN EARL GODWIN, Deceased.

Appeal by plaintiff from orders entered 14 December 2020 by Judge Paul Quinn, 11 January 2021 by Judge Joshua W. Willey, and 29 January 2021 by Judge Paul Quinn in Carteret County Superior Court. Heard in the Court of Appeals 23 February 2022.

*Womble Bond Dickinson (US) LLP, by Jesse A. Schaefer and Elizabeth K. Arias, for plaintiff-appellant, Theresa Ann Godwin.*

*Harvell and Collins, P.A., by Wesley A. Collins and Samuel K. Morris-Bloom and Harris, Creech, Ward & Blackerby, P.A., by C. David Creech, for defendant-appellee Cecil S. Harvell in his capacity as Executor of the Estate of Herman E.*

*Godwin, in his capacity as Trustee of the Herman E. Godwin Revocable Trust created under Agreement dated August 9, 2017, in his capacity as Trustee of the trust f/b/o Aiden Gaffney created under ARTICLE IV of the Herman E. Godwin Revocable Trust Agreement dated August 9, 2017, in his capacity as Trustee of the trust f/b/o Zhoe Gaffney created under Article IV of the Herman E. Godwin Revocable Trust Agreement dated August 9, 2017.*

TYSON, Judge.

Theresa Ann Godwin ("Plaintiff") appeals from orders entered granting summary judgment, a directed verdict, and finding Plaintiff's claims lacked substantial merit to Cecil S. Harvell ("Harvell"), in his capacity as Executor of the Herman E. Godwin, in his capacity as Trustee of the Herman E. Godwin Revocable Trust, in his capacity as Trustee of the trust for the benefit of Aiden Gaffney created under Article IV of the Herman E. Godwin Revocable Trust Agreement, and in his capacity as Trustee of the trust for the benefit of Zhoe Gaffney created under Article IV of the Herman E. Godwin Revocable Trust Agreement; April M. Jones; Paula K. Woody; Heather Gaylor; and, Zhoe Gaffney (collectively "Defendants"). We reverse and remand.

## I.  Background

Herman E. Godwin ("Settlor") and wife, Ellen Godwin ("Ellen") owned 76 acres of real property containing 22 rental units in and around Newport. Ellen managed the couple's finances, including collecting rent from tenants and writing checks for

the household expenses and for the rental properties. Settlor and Ellen are parents of two daughters: Plaintiff and Barbara Bittner. Bittner has a daughter, Heather Gaylor ("Gaylor"). Gaylor has two children: Zhoe Gaffney and Aiden Gaffney.

¶ 3        In November 2009, Settlor and Ellen retained Harvell to complete their estate plans. Settlor and Ellen each signed a revocable trust agreement, an irrevocable trust agreement, and deeds transferring their real property to the irrevocable and revocable trusts. Settlor executed a will to govern the distribution of his other property.

¶ 4        Settlor and Ellen appointed Plaintiff and Bittner as co-executors and co-trustees upon their deaths. Settlor funded the trusts with real property. The documents directed the assets to pass to the surviving spouse of the couple, and if no spouse survived, then in equal shares between Plaintiff and Bittner, or their living issue *per stirpes*.

¶ 5        In 2014, Settlor underwent coronary artery bypass surgery and was hospitalized for five days. Plaintiff stayed with Settlor during his hospitalization and arranged for in-home care following his discharge from the hospital. Settlor and Ellen were dissatisfied with the caregivers sent from the home health company and the family began looking for replacements.

¶ 6        Paula Woody ("Paula") was a tenant of Settlor and Ellen. Paula, who was employed as a hairdresser, volunteered to become a caregiver for Settlor and Ellen,

and was hired in late September 2014. Shortly afterwards, Paula's son, Justin Woody ("Justin"), Paula's niece, Danah Hartley ("Hartley"), and Paula's daughter, April Jones ("Jones"), were also hired as caregivers.

¶ 7    Soon after Settlor had returned home from the hospital, Ellen became ill and passed away on 18 October 2014. Following Ellen's death, Plaintiff became Settlor's attorney-in-fact ("AIF") under his 2009 estate plan. Paula, Jones, Justin, and Hartley also began collecting the rent from other tenants and managing Settlor's rental properties.

¶ 8    In December 2014, Settlor requested Plaintiff to collect timesheets from the caretakers, review them for errors, and submit claims for reimbursement from John Hancock Life Insurance Company, U.S.A., Settlor's long-term care insurance carrier.

¶ 9    Plaintiff visited Settlor in July 2015 and noticed the caretakers were only working approximately four to six hours a day. Plaintiff further noticed when she posed a question, Settlor looked to a caretaker for assistance in responding to her question. On 5 September 2015, Plaintiff told Paula that she and the other caretakers could not submit claims for hours that they had not worked, by texting to her: "I will not submit falsified claims" to John Hancock.

¶ 10    Plaintiff reported the caretakers immediately stopped being friendly with her. Plaintiff further recounted Settlor believed she was "fishing around" with the insurance policy so John Hancock would deny the claim. Settlor came to believe

Plaintiff wanted to place him into a nursing home and take control of his assets. Plaintiff told Settlor she and her sister, Bittner, did not want to place Settlor into a nursing home, but "no matter how many times [Plaintiff and Bittner] said it wasn't true, [they] kept being accused of it."

¶ 11        Plaintiff, as Settlor's AIF, feared the caretakers were taking financial advantage of Settlor. Plaintiff reviewed Settlor's credit report and bank account statements. Plaintiff discovered: (1) checks were not being signed in Settlor's handwriting; (2) checks were written out of numerical sequence; (3) checks were being written to individuals with whom Settlor did not do business; (4) checks were written for items that did not fit within Settlor's spending habits; (5) a cash withdrawal of $20,000 was made from his account; and, (6) a new credit card account in Settlor's name had been opened with a different signature from his.

¶ 12        Plaintiff was concerned about transactions involving "Sarah Burns" where on 13 August 2015 a check for $500 was written for a funeral donation and then Settlor received a car financing payment from "Sarah Burns" in November 2015. Plaintiff hired Durward Matheny, a forensic document examiner, to examine the credit card application and Settlor's checks. Matheny concluded neither were signed by Settlor, but the signatures were attempts to simulate his handwriting.

¶ 13        Bittner filed an Adult Protective Services report with the Carteret County Department of Social Services on 19 October 2015. Bittner stated Settlor was

"alienated" and "brainwashed" into fear that his daughters "only want to put him in a nursing home and take all of his money." Bittner's claim was not accepted for evaluation.

Two days later, on 21 October 2015, Plaintiff contacted the Carteret County Sheriff's Department reporting the inconsistencies in Settlor's bank accounts and alleging two caregivers had been overpaid. Deputy David Perry was assigned to investigate the claims.

During Deputy Perry's interview with Settlor, he had reported Plaintiff was "mad at him because he threatened to remove her from his will after she failed to accurately manage his finances and because she is angry that he only gave $7,500 to [Plaintiff's] daughter instead of the $15,000 he had promised to give her years ago when she was old enough."

Settlor said "he [was] perfectly capable to direct his own affairs and regrets having given [Plaintiff] power of attorney claiming at the time he did not understand what []he was doing when he signed the power of attorney partly because his wife had died recently and because he trusted his daughter." Deputy Perry reported Settlor stated, "[N]o one forged his signature on any checks[.]" Settlor further told Deputy Perry he had an appointment with his attorney, Harvell, to remove Plaintiff as his AIF and to change his will. Deputy Perry noted Settlor "was very articulate and direct in his answers."

¶ 17        Settlor decided to revise his estate plan and held a meeting with Harvell on 22 October 2015. Settlor told Harvell his daughters, Plaintiff and Bittner, were "plotting and planning" to put him on "a path toward" living in a nursing home. Harvell reported Settlor had told him that he always signed all of his checks. Harvell advised Settlor to replace Plaintiff with a different family member. Settlor instructed Harvell to remove all his real property out from the trusts. Harvell sent a letter to Plaintiff and Bittner informing them of Settlor's intention to take all his real property out of the trusts and enclosed quit claim deeds for them to sign conveying the property back to Settlor. Settlor decided to replace Plaintiff as his AIF.

¶ 18        Shortly thereafter his caregiver, Paula, called Settlor's nephew, Bill Godwin ("Godwin"), who lives in Florida. Paula asked him to serve as Settlor's AIF. Godwin was concerned because he had never met Paula, did not know why a caretaker was calling, and both of Settlor's daughters lived closer to Settlor than him. Godwin called Settlor directly and determined he "didn't sound right." Godwin noticed Settlor's tone of voice was different and he was not able to converse normally. Godwin called Plaintiff.

¶ 19        Plaintiff, Bittner, and Roy Ivey ("Ivey"), Bittner's husband, went to Settlor's bank to obtain copies of his credit card statements on 23 October 2015. While at the bank, Plaintiff, Bittner, and Ivey accessed Settlor's safety deposit box and removed $10,000 in cash. Bank employees notified Settlor that Plaintiff was attempting to

access his account statements.

¶ 20        Settlor came to the bank branch and Plaintiff told him she was there to access his bank records but did not tell him $10,000 had been removed from the safety deposit box. Settlor gave the bank permission to release the statements to Plaintiff and Bittner. Plaintiff and Bittner sought to turn over the alleged forged checks to the Carteret County Sheriff's Department, but were informed the investigation had been closed.

¶ 21        Also on 23 October 2015, Plaintiff, Bittner, Settlor, and Harvell met in Harvell's office. Harvell told Plaintiff and Bittner that Settlor "sign[ed] his name different ways." Plaintiff and Bittner refused to quit claim their interest in the real property being held in the irrevocable trust. Harvell informed Plaintiff her AIF powers would be revoked. Settlor later named attorney M. Douglas Goines ("Goines") as his AIF.

¶ 22        Plaintiff and Bittner hired Wyles Johnson ("Johnson"), an attorney, to explore terminating the employment of Settlor's caregivers. Johnson informed Plaintiff and Bittner the only way to remove the caregivers was for Settlor to be declared incompetent. Plaintiff and Bittner declined to pursue such an action.

¶ 23        Johnson contacted Goines, Settlor's AIF and relayed Plaintiff's and Bittner's concerns regarding the caregivers and Settlor's financial competency. Goines then met with Settlor and Harvell. Harvell told Goines there was a "long family history of

tension between the daughters, especially [Plaintiff], and [Settlor] . . . he lets [Plaintiff] take advantage of him . . . [and] he greatly resents the efforts of [Plaintiff] to try and take over his life."

¶ 24    Goines concluded it was "completely clear to [him] that [Settlor] is competent and quite capable of managing his affairs . . . [and] that he very much wants to manage his own affairs and is not going to voluntarily surrender that privilege to anyone."

¶ 25    Settlor's bank reported to the Carteret County Sheriff's Department that Settlor was being financially exploited on 10 November 2015.  Settlor: (1) had come into the bank branch with Paula's daughter, Jones; (2) had transferred $2,000 to Jones' deceased grandmother; and, (3) "appeared to be confused about the transaction."

¶ 26    Following a second investigation request by Bittner, Deputy Perry conducted a second personal interview with Settlor.  Deputy Perry noted Settlor "appears to be in full control of his mental facilities and fully understands his actions and those of his employees . . . [and] does not appear to be in any distress mentally or physically[.]"

¶ 27    Settlor told Deputy Perry the money had to be withdrawn from his account because an account Jones and her grandmother shared had purportedly been seized by the state for outstanding debts.  Settlor admitted being confused by the transaction, did not know Jones' grandmother, but had authorized it anyway because

Jones had assured him "everything is on the up and up."

¶ 28        Settlor stated, "No one signs any checks for me" and "All financial transactions" are authorized by me. Deputy Perry concluded he did not "believe [Settlor] is being taken advantage of by his caretakers or anyone else." Deputy Perry again closed the investigation. None of Settlor's family members were informed of the bank's allegations at the time, nor of the Carteret County Sheriff's Department's subsequent investigation.

¶ 29        On 2 December 2015, Plaintiff, Bittner, Ivey, and Godwin, traveled to Settlor's home to tell Settlor about the irregularities concerning the checks. The family members noticed family photographs were removed and missing from the home, Settlor's checkbook was not present in the drawer where it was usually kept, and files containing Settlor's important documents were missing. When the topic of checks was brought up, Settlor became uncharacteristically angry, refused to look at the cancelled checks, and went into his room.

¶ 30        Godwin left to confront Paula at her residence. Paula called law enforcement and Godwin returned to Settlor's residence. Settlor attempted to get into his vehicle, but Godwin would not allow him to drive away because he felt Settlor was not able to drive by himself at night.

¶ 31        At this time, Paula, Jones, and Justin along with law enforcement officers arrived at Settlor's house. An argument broke out between Plaintiff, Godwin, Paula,

and Jones. After Settlor's family left, Paula told Settlor "You have to get a restraining order against [Plaintiff and Bittner] because I'm not going to put up with their s—t, [and] I don't have to."

¶ 32        Settlor, through counsel, obtained an *ex parte* domestic violence protective order ("DVPO") on 14 December 2015 against Plaintiff. After being served with the 14 December DVPO, Plaintiff contacted Johnson, who referred her to attorney Joel Hancock ("Hancock"). Plaintiff is employed by the United States Department of the Treasury and holds a top-secret level security clearance. Plaintiff was concerned she could lose her security clearance due the allegations of domestic violence in the DVPO complaint. Plaintiff hired Hancock who contacted Wesley Collins, Harvell's law partner. Settlor voluntarily dismissed the 14 December DVPO.

¶ 33        After the 14 December DVPO was filed, several tenants of Settlor's properties called Plaintiff and Bittner asserting Paula had "some kind of hold" on Settlor and Settlor was "agree[ing] with everything" she said. Plaintiff did not bring these third-party allegations to Settlor for fear of a second DVPO.

¶ 34        The following day on 15 December 2015, Settlor visited a neurologist. Settlor sought a "letter of mental competency to give to his attorney." Settlor complained of "memory problems." The neurology clinic noted Settlor did not know the day of the week and his attention and concentration were impaired. The neurology clinic ordered imaging and clinical tests. The neurologist concluded all tests showed

cognitive impairment and declined to determine or confirm Settlor's legal competency, because it required "a higher level of neurocognitive, behavioral, and comprehension than we can presently perform in this office. Based on these tests alone, we are not in a position to give an opinion regarding competency."

¶ 35     On 17 November 2015, Harvell drafted a document naming Paula's daughter, Jones, as Settlor's healthcare agent. In January 2016, Settlor decided to again revise his estate plan. Settlor replaced Plaintiff and Bittner as executor and named Harvell as executor. Settlor's new will also included specific bequests of $7,000 each to Paula, Jones, and Zhoe. The residuary of Settlor's estate was to be divided between Plaintiff and Bittner *per stirpes* if both survived Settlor. If Bittner predeceased Settlor, Plaintiff would inherit the entire residuary estate.

¶ 36     Plaintiff and Settlor communicated sporadically by phone with no face-to-face visits from January 2016 until Marth 2017. In March 2017, Settlor again revised his estate plan. Settlor retained Harvell to draft the will and trusts and named Harvell as his executor. The will included $7,000 bequests each to Paula and Jones. The will poured the estate residuary into a new revocable testamentary trust. The beneficiaries of the revocable testamentary trust were granddaughter Gaffney, and her children Zhoe and Aiden. No provisions in the will were made for Plaintiff or her children. Settlor's earlier irrevocable and revocable trusts holding the real property remained unchanged.

¶ 37        In April 2017, Plaintiff received a call from a nurse concerning Settlor's annual medical examination. The report concluded Settlor's mental health was deteriorating and he was relying more upon his caretakers. On 26 July 2017, Bittner died. Around the time of Bittner's funeral, Ivey showed Settlor a letter from Plaintiff, which contained the medical evaluation and a note suggesting the daughters to re-evaluate their position to not seek to have Settlor declared incompetent to fire the caretakers.

¶ 38        Settlor became "fed up" with Plaintiff and contacted Harvell to remove Plaintiff from his estate plan and pass his estate to Bittner's lineal heirs. In the 9 August 2017 estate plan, Settlor revoked the prior revocable trust, the testamentary trust created by the pour over will, and conveyed his real property back to himself. Settlor deeded the real property into a new trust which distributed the real property to Gaffney, Zhoe, and Aiden.

¶ 39        Settlor executed a new will with the same distribution provisions from the March 2017 will. Harvell testified he had no concerns about Settlor's mental capacity or him being subject to undue influence nor did anyone else in his office who had witnessed the execution of the documents.

¶ 40        On 22 August 2017, Plaintiff came to Settlor's home in Newport. Settlor had paid for and travelled to Florida with his caregivers and their families. Plaintiff stopped by Settlor's house and noticed the television was on, but no one was home. Plaintiff called Paula, who told her about Settlor and her family's trip to Florida.

Settlor called Harvell and asked him to call Plaintiff to "ask her to leave and come to the house when [he is] there."

Settlor also asked Harvell to call law enforcement to "make sure everything is ok." Harvell called Plaintiff and relayed this message and called law enforcement to check on the property. Harvell also sent Plaintiff a letter memorializing Settlor's wishes from the telephone conversations.

On 6 September 2017 law enforcement officers were called to Settlor's home by Justin for reports of a trespass by Debbie Turnage ("Turnage"), a friend of Plaintiff. Turnage asserted she was invited into Settlor's home and Settlor never asked her to leave. She was neither cited nor arrested. Later that day, Wesley Collins, Harvell's law partner, met with the caretakers to discuss the preparation of another DVPO complaint against Plaintiff.

On 8 September 2017 Settlor through counsel filed another DVPO. A protective order was entered against Plaintiff. The parties attended a hearing on 14 September 2017. The parties entered a contact agreement, through counsel, which established Plaintiff could maintain contact with Settlor, but she would not have any involvement in his financial affairs. The 8 September 2017 DVPO was voluntarily dismissed.

In November 2017 Settlor could not recognize any family members at a family reunion. Settlor was diagnosed with terminal cancer in January 2018. Plaintiff

moved into Settlor's residence for his final weeks. On 27 February 2018, Settlor died.

¶ 45 In August 2018, Plaintiff filed a caveat and trust contest. Plaintiff's complaint alleged the testamentary instruments and deeds executed by Settlor in the two years prior to his death were invalid due to incapacity and undue influence.

¶ 46 The trial court heard arguments on Defendants' motion for summary judgment on 28 October 2020. The trial court granted Defendants' motion for summary judgment on the issue of Settlor's capacity by correspondence to the parties on 8 November 2020. The trial court drafted an order granting Defendants' motion for summary judgment dated 12 November 2020 and it was filed on 11 January 2021.

¶ 47 At the close of Plaintiff's case-in-chief, the trial court granted Defendants' motion for a directed verdict on undue influence on 14 December 2020. Plaintiff appealed both the order granting summary judgment and the order granting a directed verdict on 12 January 2021.

¶ 48 Defendants moved for attorney's fees pursuant to N.C. Gen. Stat. §§ 6-21(2) and 6-21.5 (2021) on 14 January 2021. Following a hearing, the trial court entered an order on 29 January 2021 finding Plaintiff's claims lacked substantial merit and preserved the issue of attorney's fees for a hearing after the appeal has been ruled upon. Plaintiff also appealed this order.

## II.    Jurisdiction

¶ 49 Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b)(1) (2021).

### III.    Issues

Plaintiff argues the trial court erred by: (1) granting Defendants' motion for summary judgment; (2) granting Defendants' motion for a directed verdict; (3) excluding the testimony of Godwin; and, (4) concluding Plaintiff's claims lacked substantial merit.

### IV.    Summary Judgment

The trial court granted Defendants' motion for summary judgment on the issue of Settlor's capacity to execute the will and trusts.

### A. Standard of Review

"A caveat is an *in rem* proceeding" that operates as "an attack upon the validity of the instrument purporting to be a will." *In re Will of Cox*, 254 N.C. 90, 91, 118 S.E.2d 17, 18 (1961) (citation omitted).

Summary judgment may be entered in a caveat proceeding where there are no genuine issues as to material facts. *See In re Will of McCauley*, 356 N.C. 91, 100-01, 565 S.E.2d 88, 95 (2002). This Court reviews the trial court's ultimate determination of the summary judgment motion *de novo*. *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008).

Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that any party is

entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2021). Because of the factual nature of the issues presented during a caveat proceeding, "[s]ummary judgment should be entered cautiously." *Seagraves v. Seagraves*, 206 N.C. App. 333, 338, 698 S.E.2d 155, 161 (2010).

## B. Analysis

¶ 55 "[A] presumption exists that every individual has the requisite capacity to make a will, and those challenging the will bear the burden of proving, by the greater weight of the evidence, that such capacity was wanting." *In re Will of Sechrest*, 140 N.C. App. 464, 473, 537 S.E.2d 511, 517 (2000). Our Supreme Court has confirmed: "A testator has testamentary capacity if he comprehends the natural objects of his bounty; understands the kind, nature and extent of his property; knows the manner in which he desires his act to take effect; and realizes the effect his act will have upon his estate." *In re Will of Buck*, 130 N.C. App. 408, 412, 503 S.E.2d 126, 130 (1998) (citation omitted), *aff'd*, 350 N.C. 621, 516 S.E.2d 858 (1999).

¶ 56 This Court has stated: "To establish lack of testamentary capacity, a caveator need only show that any one of the essential elements of testamentary capacity is lacking." *In re Estate of Phillips*, 251 N.C. App. 99, 110, 795 S.E.2d 273, 282 (2016). A caveator cannot "establish lack of testamentary capacity where there [is] no specific evidence relating to testator's understanding of his property, to whom he wished to give it, and the effect of his act in making a will <u>at the time the will was made</u>." *In*

*re Estate of Whitaker*, 144 N.C. App. 295, 298, 547 S.E.2d 853, 856 (2001) (citation and internal quotation marks omitted) (emphasis original). It is not sufficient for a caveator to present "only general testimony concerning testator's deteriorating physical health and mental confusion in the months preceding the execution of the will." *In re Will of Buck*, 130 N.C. App. at 413, 503 S.E.2d at 130.

¶ 57        A testator is entitled to disinherit a child. *See Ladd v. Estate of Kellenberger*, 314 N.C. 477, 483, 334 S.E.2d 751, 756 (1985) ("The law in North Carolina does not prohibit parents from disinheriting children. The right to give or take property is not a natural or inalienable right, but one of positive law, created and controlled by the legislature.") (citing *Pullen v. Commissioners of Wake County*, 66 N.C. 361, 363-64 (1872)).

¶ 58        Here, viewed in the light most favorable to Plaintiff, as the non-movant, Plaintiff's affidavits, answers during depositions, and evidence presented during the summary judgment hearing tend to show Settlor was suffering from dementia at the time the will and trusts were executed. The affidavits and answers during deposition tend to indicate Settlor's confusion and lack of knowledge regarding who was managing his finances, what real property he owned, and who were the beneficiaries of his will and trusts. Viewed in the light most favorable to, and with all reasonable inferences that could be drawn therefrom to Plaintiff, genuine issues of material fact exist concerning Settlor's testamentary capacity. The trial court erred in granting

summary judgment. The 11 January 2021 summary judgment order is reversed.

## V. Directed Verdict

Plaintiff argues the trial court erred in granting a directed verdict in favor of Defendants on the issue of undue influence.

## A. Standard of Review

"The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." *Davis v. Dennis Lilly Co.*, 330 N.C. 314, 322, 411 S.E.2d 133, 138 (1991) (citation omitted).

Our Supreme Court has held:

> In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor.

*Turner v. Duke University*, 325 N.C. 152, 158, 381 S.E.2d 706, 710 (1989) (citation omitted). "If there is more than a scintilla of evidence supporting each element of the nonmoving party's claim, the motion for directed verdict or JNOV should be denied." *Horner v. Byrnett*, 132 N.C. App. 323, 325, 511 S.E.2d 342, 344 (1999) (citation omitted). "A scintilla of evidence is defined as very slight evidence." *Hayes v. Waltz*, 246 N.C. App. 438, 442-43, 784 S.E.2d 607, 613 (2016) (citation omitted).

## B. Analysis

¶ 62 In the context of a will caveat, undue influence is "a fraudulent influence over the mind and will of another to the extent that the professed action is not freely done but is in truth the act of the one who procures the result." *In re Estate of Loftin*, 285 N.C. 717, 722, 208 S.E.2d 670, 674-75 (1974).

¶ 63 "There are four general elements of undue influence: (1) a person who is subject to influence; (2) an opportunity to exert influence; (3) a disposition to exert influence; and (4) a result indicating undue influence." *In re Sechrest*, 140 N.C. App. at 469, 537 S.E.2d at 515 (citation omitted).

¶ 64 Our Supreme Court noted a number of factors, in *In re Andrews*, which are relevant to the issue of undue influence:

1. Old age and physical and mental weakness.

2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.

3. That others have little or no opportunity to see him.

4. That the will is different from and revokes a prior will.

5. That it is made in favor of one with whom there are no ties of blood.

6. That it disinherits the natural objects of his bounty.

7. That the beneficiary has procured its execution.

*In re Andrews*, 299 N.C. 52, 55, 261 S.E.2d 198, 200 (1980) (citation and quotation

marks omitted).

A caveator is "not required to demonstrate the existence of every factor to prove undue influence, because undue influence is generally proved by a number of facts, each one of which standing along may be of little weight, but taken collectively may satisfy a rational mind of its existence." *In re Estate of Phillips*, 251 N.C. App. at 111, 795 S.E.2d at 282 (citation and internal quotation marks omitted). This Court has further held: "Whether these or other factors exist and whether executor unduly influenced decedent in the execution of the Will are material questions of fact." *In re Will of Smith*, 158 N.C. App. 722, 727, 582 S.E.2d 356, 360 (2003).

At oral argument, Defendants asserted the allegations that the caregivers, who received none of the real property at issue and received only bequests of $7,000 each, from an almost two-million-dollar estate, were the alleged undue influencers is unsupported by precedent. This assertion is contrary to our Supreme Court's holding in *In re Andrews*, which cautions "It is impossible to set forth all the various combinations of facts and circumstances that are sufficient to make out a case of undue influence because the possibilities are as limitless as the imagination of the adroit and the cunning." *In re Andrews*, 299 N.C. at 54, 261 S.E.2d at 200. In evaluating allegations of undue influence, our Supreme Court held "it is impossible for the law to lay down tests to determine its existence with mathematical certainty." *Id.* at 54-55, 261 S.E.2d at 200.

¶ 67        Viewed in the light most favorable to the nonmoving party, the evidence produced at trial demonstrates and emphasizes the caregivers overarching involvement in Settlor's life. In November 2009, Settlor and Ellen appointed their daughters Plaintiff and Bittner as co-executors and co-trustees upon their deaths. Settlor funded these trusts with real property. The documents directed the assets to pass to the surviving spouse of the couple, and if no spouse survived, then in equal shares between Plaintiff and Bittner, or their living issue *per stirpes*.

¶ 68        The evidence in the record and over twelve days of testimony asserts factual issues concerning Settlor's physical and mental weakness around the time of the execution of the 9 August 2017 estate plan; the caregivers' status as propounders; and, the refusal of the caregivers to allow Plaintiff and Settlor's other family members to visit and see Settlor without supervision. No evidence tends to show Plaintiff ever communicated any threats or intent to harm Settlor. Plaintiff acted in conjunction with her sister, first cousin, and other family members to alert Settlor to non-family members and employees potentially taking advantage of Settlor and his assets.

¶ 69        Medical personnel and employees of financial institutions observed Settlor's unusual behaviors and actions and, on their own initiative, alerted family members and law enforcement to questionable activities and expenses by non-family caregivers and employees who were related to each other, who had accompanied Settlor, managed his daily schedule, and overtly influenced his activities. These questionable

actions and activities by caregivers were shared with Settlor's fiduciaries, who assisted and facilitated these activities, in derogations of the warnings and concerns of medical personnel, bank employees, Settlor's children, a son-in-law, and Settlor's nephew.

¶ 70 After surviving summary judgment and during twelve days of testimony Plaintiff presented more than a "scintilla of evidence" to preclude the trial court entering a directed verdict for Defendants. *Hayes*, 246 N.C. App. at 443, 784 S.E.2d at 613. The trial court erred in granting Defendants' motion for a directed verdict. The trial court's 14 December 2020 order entering a directed verdict is reversed.

## VI. Exclusion of Godwin's Testimony

¶ 71 Plaintiff asserts the trial court erred in excluding Godwin's testimony, specifically his statement Settlor stated he wanted his "[real] property to go to [Plaintiff]."

¶ 72 Almost a century ago, our Supreme Court held:

> It has been generally held that declarations, oral or written, by the deceased may be shown in evidence upon the trial of an issue involving his mental capacity, whether such declarations were made before, at or after the date on which it is contended that the deceased was of unsound mind.

*In re Will of Brown*, 194 N.C. 583, 595, 140 S.E.2d 192, 199 (1927) (citation omitted).

"Declarations made by the testator, in order to be admissible, must be made at a time not too remote from the making of the will." *In re Will of Hall*, 252 N.C. 70, 81, 113 S.E.2d 1, 9 (1960). Settlor's nephew, Godwin, who was never a beneficiary under any iteration of Settlor's wills or trusts, heard Settlor's purported statement five months after the testamentary documents at issue were executed. The trial court erred in excluding Godwin's testimony. The trial court's order excluding Godwin's testimony is reversed.

## VII.    Substantial Merit

The trial court held Plaintiff's claims lacked substantial merit. In light of this Court's holdings to reverse and remand for further proceedings, the trial court's holding of no substantial merit is vacated.

## VIII.    Conclusion

The trial court erred by: granting Defendants' motion for summary judgment on the issue of capacity; granting Defendants' motion for a directed verdict on the issue of undue influence; granting Defendants' motion to exclude Godwin's testimony; and, in holding Plaintiff's claims lacked substantial merit.

We reverse the trial court's orders granting summary judgment, granting a directed verdict, and excluding Godwin's testimony, and remand. We vacate the trial court's order holding Plaintiff's claims lacked substantial merit. *It is so ordered.*

REVERSED IN PART; VACATED IN PART; AND REMANDED.

Judges CARPENTER and JACKSON concur.